In re Carol M. HANKS, Adam D. Crane, and David A. Crane, three minor children.*

Supreme Court of Delaware.

Submitted: June 14, 1988.
Decided: Jan. 20, 1989.

Ben T. Castle (argued), and Alison Whitmer Tumas, of Young, Conaway, Stargatt & Taylor, Wilmington, for appellant.

P. Clarkson Collins, Jr. (argued), and Mary M. Johnston, of Morris, James, Hitchens & Williams, Wilmington, for appellee.

Before CHRISTIE, C.J., HORSEY and MOORE, JJ.

CHRISTIE, Chief Justice:

In this case, the Court is called upon to examine the application of the Delaware statute providing for termination of parental rights when an individual has failed "to

---

* Pursuant to Supreme Court Rule 7(c), this Court has used pseudonyms to protect the identities of the natural parent and the children.

plan adequately for the child's physical needs or his mental and emotional health and development...." 13 *Del.C.* § 1103(5). This Court has, of course, recognized that, under certain specified circumstances, the State may terminate parental rights when it is clear that such action is in the best interest of a child. *In re Burns*, Del.Supr., 519 A.2d 638 (1986). However, this Court also pointed out that parental rights may not be terminated without full compliance with the statutory requirements and the due process rights of parents. *Id.* at 640. Here, we must specifically address the constitutional sufficiency of the statutory standards set forth in 13 *Del.C.* § 1103(5) as they apply to the termination of parental rights. The appellant notes that neither of the key words in the statute, "plan" and "adequately", are defined. Therefore, the appellant contends that the statute as a whole is unconstitutionally vague because it fails to give ordinary citizens fair warning as to what conduct will justify termination of parental rights. We hold that the wording of the statute is not unconstitutionally vague and that, under the circumstances of the case, the termination of parental rights was justified.

## I.

The appellant, Ms. Allison Crane, is the mother of three children, Carol, Adam, and David, who were respectively eleven, eight, and four and a half years old at the time this appeal was heard. The children are the subject of a suit brought by the State to terminate Ms. Crane's parental rights.

Ms. Crane's involvement with the Children's Bureau of Delaware, Inc. ("Children's Bureau"), began in May, 1983. At that time, Ms. Crane was the mother of the two children, then aged six and three, and she was seven months pregnant with her third child. Mr. Crane, her husband, deserted the family, leaving it with inadequate financial resources. Since Ms. Crane had no means with which to provide food for her children, she contacted the Children's Bureau for assistance. Therese Gilchrist, the social worker who responded to Ms. Crane's request, went to her home and found it to be "messy" and "in complete disarray." Social workers who met with Ms. Crane described her as having an "unmotivated" attitude, as a result of her being depressed and exhausted.

Several workers helped to secure food for the family and clean the apartment. On visits made over the next few months, social workers consistently found the household to be running low on food and in disarray. The children were generally unsupervised and "ran rampant" throughout the house.

The Division of Child Protective Services ("DCPS") became involved in June, 1983, after it received a phone call from one of Ms. Crane's relatives who said that Ms. Crane was abusing her children physically (hitting them with a baseball bat) and emotionally. On June 30, 1983, Carol Robinson, a DCPS intake worker, made an unannounced visit to Ms. Crane's home. Ms. Crane initially denied hitting Carol, although she subsequently said that the bat was only plastic. Later during the interview, Ms. Crane went to get Carol's report card from a drawer. When she was unable to find it she became extremely upset, accused Carol of "playing head games" with her, and repeatedly slapped Carol across the face. Ms. Crane then looked in her pocketbook and found the report card there. At the end of the interview, Ms. Crane told Ms. Robinson that her self-image was very low, and that she felt trapped. She wondered out loud whether it would be better to give up her children. On July 25, 1983, Ms. Robinson again visited Ms. Crane, and at that time Ms. Crane agreed her children should be placed in temporary foster care and signed the forms for voluntary placement. Carol and Adam were then placed in foster care.

On August 9, 1983, Ms. Crane gave birth to her third child, David. The following day Ms. Gilchrist and Karen Kirkpatrick, another DCPS worker, visited Ms. Crane in the hospital. Ms. Crane stated that she wished to place the baby in foster care temporarily. Ms. Crane signed placement papers, and on August 11, 1983, the Chil-

dren's Bureau placed David in a foster home.

Upon Ms. Crane's release from the hospital after the birth of David, Ms. Gilchrist arranged for her to stay at the Mary Mother of Hope House, since she had been evicted from her apartment. On August 22, 1983, Ms. Crane was involuntarily committed to St. Francis Hospital, where she was treated for depression. On August 26, 1983, Ms. Crane was discharged from St. Francis Hospital into the custody of her father. She, therefore, went to live in his home in Parksburg, Pennsylvania. Ms. Crane continued to have problems interacting with other people, and on September 15, 1983, she was involuntarily committed to Sacred Heart Hospital in Haverford, Pennsylvania. Ms. Crane remained there until October 10, 1983, when she was again released to her father's care.

In October, 1983, Ms. Gilchrist met with Ms. Crane to develop a written plan which provided that the children would remain in foster care for the time being, with the goal of achieving family reunification in January, 1984. Ms. Crane was to have supervised visits with the children twice a month. The plan also called for Ms. Crane to remain in a stable environment, attend counseling and therapy, and take recommended medication. The plan was signed on October 14, 1983.

The bimonthly visits scheduled for Ms. Crane and her children did not proceed smoothly. At times there was very little interaction between Ms. Crane and her children. At other times Ms. Crane, who was prone to outbursts, was described as having become obsessed with trivial matters. The visits were temporarily interrupted by Ms. Crane's voluntary admission to Sacred Heart Hospital on December 14, 1983. At that time Ms. Crane, who stated that she had been hearing voices, was diagnosed as schizophrenic, paranoid type. Ms. Crane was released from the hospital on January 9, 1984.

Since the first plan was unsuccessful, Ms. Gilchrist met with Ms. Crane on January 27, 1984, to formulate a second plan. The second written plan did not call for the children to live with Ms. Crane, but instead aimed to have them reside with one of Ms. Crane's relatives. Until this occurred, Ms. Crane would have regularly supervised visits with the children. In the event placement with Ms. Crane's relatives was not possible, the plan provided that the children would be put up for adoption. In addition, Ms. Crane agreed to continue to receive therapy and to take appropriate medication.

In April, 1984, upon the recommendation of a psychiatrist, the Children's Bureau unilaterally ceased visitations between Ms. Crane and her children. By July, 1984, the time the second plan was to go into effect, the Children's Bureau determined that it would not be able to place the children with any of Ms. Crane's relatives because those relatives who had initially expressed an interest in providing for the children declined to do so when they realized that the responsibility involved a long-term commitment. Meanwhile, Ms. Crane's mental condition and emotional health were not improving. Thus, foster care of the children, which is designed to be temporary, had become long term.

The Children's Bureau, acting in what it perceived to be the best interests of the children, then formulated a new plan pursuant to 13 *Del.C.* § 1103(5).[1] This plan

---

**1.** The relevant portion of 13 *Del.C.* § 1103 provides:

The procedure for termination of parental rights for the purpose of adoption or, if a suitable adoption plan cannot be effected, for the purpose of providing for the care of the child by some other plan which may or may not contemplate the continued possibility of eventual adoption, may be initiated whenever it appears that:

. . . . .

(5) The parent or parents of any child, or any person holding parental rights over such

child, are not able, or have failed, to plan adequately for the child's physical needs or his mental and emotional health and development and:

a. In the case of a child in the care of an authorized agency:

1. The child has been in the care of an authorized agency for 1 year, or there is a history of previous placement or placements of this child, or a history of neglect, abuse or lack of care of other children by this parent; and

called for termination of Ms. Crane's parental rights. Such termination of parental rights would make the children eligible for adoption, and such termination was perceived as a means of bringing familial stability to their lives. On December 17, 1984, the Family Court Judicial Review Board met and recommended this third plan for the children.

Pursuant to the new plan, the Children's Bureau filed a petition for termination of Mr. Crane's and Ms. Crane's parental rights on January 25, 1985. A hearing was scheduled for July 3, 1985. Before the hearing could be held, Ms. Crane was involuntarily committed to Haverford State Hospital and diagnosed as having schizophrenia, paranoid type, and this time the illness was listed as chronic. The hearing as to the proposed termination was postponed indefinitely because of her hospitalization. Eventually, however, Ms. Crane was allowed to attend the rescheduled hearing on February 25, 1986, although she was still hospitalized. She was formally released from the hospital on June 5, 1986.

By an order dated April 14, 1986, the Family Court denied the Children's Bureau's petition for termination of parental rights and ordered that action on the petition be postponed for at least six months. After that period either party could request a rehearing. During the interim, the children were to remain in the custody of the Children's Bureau, and Ms. Crane was to be permitted to resume supervised monthly visits with them.

A second hearing concerning termination of parental rights was held on April 25, 1987, and much evidence was presented at that hearing.

Elizabeth Chapman, an in-take caseworker for the Chester County Children In Need Service, testified concerning a home evaluation report she had prepared on Ms. Crane. Ms. Chapman stated that she had met with Ms. Crane on two occasions in February, 1987, to prepare her report.

Ms. Chapman testified that the home where Ms. Crane was then staying, a boarding house for mentally disturbed adults in Coatsville, Pennsylvania, was not available as a place to house children. Ms. Chapman also testified that although Ms. Crane expressed the desire to take care of her children, when asked if she would be able to take care of them Ms. Crane "did not respond to the question." Ms. Chapman said that she had no indication from her conversations with Ms. Crane that Ms. Crane had "an adequate knowledge of individualized skills and child-care knowledge to care for her children."

Ms. Irma Scott, a caseworker for the Children's Bureau, testified that Ms. Crane's children had come to think of their respective foster parents as their "psychological parents" and had "bonded" with them. She also testified that the children had stated that if Ms. Crane could not get well enough to take care of them, they would like to remain with their foster parents.

Ms. Mary Alice Brogan, Coordinator of Placement Services for the Children's Bureau, testified that the children in this case would be highly placeable. She verified that the petition for termination of parental rights had been filed to make the children eligible for adoption. It was her opinion that adoption would give the children a desirable sense of permanency.

Dr. Anita Amural, a professor of psychiatry, testified that Ms. Crane had been diagnosed as a schizophrenic, chronic paranoid. Dr. Amural noted that Ms. Crane continues to have periodic hallucinations where she hears voices inside of herself,

---

2. The conditions which led to the child's placement still persist, and there appears to be little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future.

b. In the case of a child in the home of the stepparent or blood relative:

1. The child has resided in the home of the stepparent or blood relative for a period of at least 1 year; and

2. The Court finds the noncustodial parent or parents incapable of exercising parental responsibilities, and that there appears to be little likelihood such parent or parents will be able to exercise such parental responsibilities in the foreseeable future.

and she rated Ms. Crane's psychiatric condition as "moderately severe to severe." Dr. Amural was of the opinion that Ms. Crane's psychiatric condition requires high doses of medication, and that Ms. Crane was presently unable to care for herself with basic life skills. Dr. Amural concluded that the termination of parental rights was in the best interests of the children.

The testimony of another psychiatrist, Dr. Robert A. Gorkin, was also presented. Dr. Gorkin testified that he had seen Ms. Crane at least seventeen times since October, 1986. He said that Ms. Crane had "demonstrated a number of signs and symptoms of schizophrenia," which included "hallucinations, both auditory and visual, and delusions." Dr. Gorkin stated that Ms. Crane was suffering from active psychosis, and that in his opinion it was unlikely that she could recover enough in the near future to be able to adequately care for herself, or her children, without supervision.

Ms. Crane also testified at the hearing. She stated that she shared her room at the home with another boarder. She said that the woman who ran the boarding house prepared her meals and gave her medication three times a day. Ms. Crane testified that she saw a doctor and a therapist once a week. She indicated that she still heard voices, although she said she didn't "hear as many voices" as she used to hear. She stated that the voices would "cuss at me and they just keep going over and over saying bad things." Ms. Crane stated that she was opposed to permanent adoption and instead favored some type of "open" adoption, where her children could remain with a foster family, and she would be allowed to visit with them.

At the hearing, Ms. Crane's attorney asserted that 13 *Del.C.* § 1103(5) violated Ms. Crane's constitutional right to due process because the State had failed to explore less drastic remedies as it should have in view of the nature of the interests at stake. The Family Court rejected this contention

and indicated that Ms. Crane had no ground for asserting a due process claim because she had been given a full and fair hearing. Moreover, less drastic remedies, in the form of the first two plans, had been attempted.

Based on the extensive evidence presented by the Children's Bureau at the termination hearing, the Family Court concluded that the Children's Bureau had proven by clear and convincing evidence that the statutory requirements set out in 13 *Del.C.* § 1103(5) existed and that termination of parental rights was in the best interests of the children. Therefore, on June 12, 1987, the Family Court ordered parental rights terminated.[2]

On appeal, Ms. Crane contends that the General Assembly's failure to define the words "plan" and "adequately" in 13 *Del. C.* § 1103(5) renders the statute unconstitutionally vague. Additionally, she contends that under the circumstances of this case, her children are not in present danger or threatened by immediate harm, and therefore the State is without the requisite compelling interest to terminate her parental rights. Finally, she contends that there was insufficient evidence to support the decision of the Family Court.

II.

■ Ms. Crane first contends that 13 *Del.C.* § 1103(5), which authorizes termination of parental rights upon a finding of that a parent failed to "plan adequately" for a child's needs and health, violates her right to due process of law under the fourteenth amendment because it is unconstitutionally vague. In support of this contention, Ms. Crane points out that the words "plan" and "adequately" are not defined in the statute and that the statute also fails to enumerate any elements by which "adequately" is to be judged. Ms. Crane argues that 13 *Del.C.* § 1103(5) thus fails to give ordinary citizens fair warning as to what conduct is prohibited and, therefore, the statute results in arbitrary and discrim-

---

**2.** The Family Court order also terminated Mr. Crane's parental rights. Mr. Crane has not ap-

pealed the order.

inatory applications of the law, in violation of her constitutional rights.

Since the appellant does not raise any first amendment claim, it is necessary for her to show that the statute she is challenging is vague as applied to her. *Wright v. State*, Del.Supr., 405 A.2d 685, 687 (1979). As the Third Circuit Court of Appeals stated in the case of *Aiello v. City of Wilmington, Delaware*, 3d Cir., 623 F.2d 845 (1980), "[w]hen raising a claim of unconstitutional vagueness ... the litigant must demonstrate that the statute under attack is vague as applied to his own conduct, regardless of its potentially vague application to others." *Id.* at 850; *see also Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (declining to invalidate ordinances which were undeniably applicable to the defendant).

The United States Supreme Court has stated that vague statutes are unconstitutional because "[v]ague laws offend several important values." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222, 227 (1972). In the *Grayned* case, the Supreme Court recognized that while "man is free to steer between lawful and unlawful conduct," vague laws frustrate this choice because they "may trap the innocent by not providing fair warning." *Id.* at 108, 92 S.Ct. at 2228–29, 33 L.Ed.2d at 227. Hence, a law may be found unconstitutionally vague if it fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id.*

When considering whether a statute violates due process of law, the court should determine whether "men of common intelligence must necessarily guess at its meaning and differ as to its application...." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926). The Supreme Court, however, "has consistently held that lack of precision is not itself offensive to the requirements of due process." *Roth v. United States*, 354 U.S. 476, 491, 77 S.Ct. 1304, 1312, 1 L.Ed.2d 1498, 1510–11 (1957).

Thus, in order to give the average person "fair notice," a statute is not required to provide mathematical certainty. *Grayned v. City of Rockford*, 408 U.S. at 110, 92 S.Ct. at 2300, 33 L.Ed.2d at 228–29. In fact, standards of mathematical precision are neither possible nor desirable in the field of family law. In a field such as this "[n]o inflexible rule can or should be laid down ... but each case must be decided on its own peculiar facts." *In re Dingee*, Del. Supr., 328 A.2d 139, 140 (1974). The Supreme Court has also held that when legislators use words of common understanding the words will be deemed to "clearly and precisely" delineate the reach of a statute. *Cameron v. Johnson*, 390 U.S. 611, 616, 88 S.Ct. 1335, 1338, 20 L.Ed.2d 182, 187 (1968); *see also* Comment, *Application of the Vagueness Doctrine to Statutes Terminating Parental Rights*, 80 Duke L.J. 336, 348 (1980) (endorsing the common meaning standard for vagueness challenges to parental rights termination statutes).

Turning to the statute itself, we hold that the words "plan" and "adequately" are ordinary terms which are commonly used and understood. They are simple, nontechnical words. Individuals to whom this statute applies need not guess as to their meaning. This Court has previously upheld the constitutionality of the predecessor of 13 *Del.C.* § 1103(4), finding that the use of the words "not fitted" did not render the statute unconstitutionally vague because the words have "sufficient common usage and dictionary meaning." *In re Five Minor Children*, Del.Supr., 407 A.2d 198, 199 (1979) (*en banc*), *appeal dismissed*, 450 U.S. 382, 101 S.Ct. 1495, 67 L.Ed.2d 312 (1981), *reh'g denied* 458 U.S. 1117, 102 S.Ct. 3502, 73 L.Ed.2d 1379 (1982); *see also In re Dingee*, 328 A.2d at 140. Similarly, most courts have upheld statutes involving termination of parental rights employing comparably common and readily understood language. *See, e.g., Chandler v. Cochran*, Ga.Supr., 275 S.E.2d 23, 26–27, *cert. denied*, 454 U.S. 872, 102 S.Ct. 342, 70 L.Ed.2d 177, *reh'g denied*, 454 U.S. 1094, 102 S.Ct. 665, 70 L.Ed.2d 635 (1981) ("failed significantly" to "make bona fide attempt to communicate with child" or

to "provide for the care and support of the child"); *In re Interest of Metteer*, Neb. Supr., 279 N.W.2d 374, 377–78 (1979) (*inter alia*, that parents are unable to discharge "parental responsibilities"); *In re V.D.D.*, S.D.Supr., 278 N.W.2d 194, 196 (1979) (unable to provide "proper care"); *In re Sherman M.*, 39 Ca.App.3d 40, 113 Cal.Rptr. 847, 848–49 (1974) ("habitually intemperate"); *see also* Annotation, *Validity of State Statute Providing for Termination of Parental Rights*, 22 A.L.R.4th § 3[c], at 792 (1983). It should also be noted that judicial decisions concerning cases tried pursuant to 13 *Del.C.* § 1103 have consistently required the trial court to make findings of fact to support each element of its decision.

After reviewing the substantial body of evidence before it, the Family Court found that the Children's Bureau had satisfied the statutory requirements. The Family Court found that the children had been in State care for a period of time well in excess of the statutory minimum of one year and that the mother continues to have a serious mental illness which is likely to continue.

We rule that the provisions of 13 *Del.C.* § 1103(5) fairly appraised Ms. Crane, in common language, of the type of conduct which would result in the termination of her parental rights. The statute is not deemed to be unconstitutionally vague.

### III.

Ms. Crane also contends that in order for the State to establish an interest so compelling that it justifies the termination of parental rights, the State must show that the children are exposed to actual harm. Additionally, she contends that the State and the trial court erred by failing to consider a wider range of less extreme alternatives to termination of parental rights. In essence, Ms. Crane seeks to maintain the *status quo* so that the children would remain in foster care, and she would continue to have the right to supervised visits with them when her condition made such visits feasible.

The State has an important interest in protecting the welfare of its minor children who have been placed in the custody of the State because their natural parents are unable to provide adequate care. *See Stanley v. Illinois*, 405 U.S. 645, 649, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 557 (1972) (recognizing the state's "right" and "duty" to protect minor children); *In re Five Minor Children*, 407 A.2d at 199 (holding that involuntary termination of parental rights on the ground of unfitness serves a legitimate social end); *In re Burns*, Del. Supr., 519 A.2d 638, 644 (1986) (holding that "[t]he interests of the child remain paramount, and all questions of statutory interpretation must be settled in light of this objective.").

■ Although the State's interest in protecting minors is strong, its authority is not absolute. The State's interest in protecting children must be balanced against a parent's constitutional right to raise his or her children free from governmental interference. *Daber v. Division of Child Protective Services*, Del.Supr., 470 A.2d 723, 726 (1983); *see also Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (recognizing the integrity of the family unit as one of the fundamental rights guaranteed by the United States Constitution). Parental rights do not "depend on societal standards or mores of lifestyle, age, economic achievement or sex." *In re Burns*, 519 A.2d at 645 (citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599, 606 (1982)). Thus, a parent's unorthodox lifestyle or unfortunate economic status does not provide a basis for the termination of parental rights. *In re Five Minor Children*, 407 A.2d at 199.

■ The State, therefore, may not authorize the termination of the legal and social relationship between a parent and a minor child absent a showing of a compelling state interest. Indeed, as this Court has stated:

> Fewer rights are more sacred than those which derive from the parent-child relationship. A society which arrogates to itself the power to intervene and disrupt that relationship can do so only for the most compelling reasons necessary to

correct or protect a child from circumstances which directly threaten or affect the minor's physical or emotional health. The State and its agencies are not in the business of determining or otherwise interfering with the parent-child relationship on any less substantial grounds. *Daber v. Division of Child Protective Services*, 470 A.2d at 726.

In Delaware, the statutory scheme to deal with problems which may arise in family relationships, 13 *Del.C.* § 1103, recognizes the parent's strong interest in his or her child. The State protects the parent's interest by requiring a showing, by clear and convincing evidence, that the parent is unable to meet the statute's guidelines before parental rights will be terminated. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Patricia A.F. v. James R.F.*, Del.Supr., 451 A.2d 830, 831–32 (1982) (*en banc*) (overruling in part *In re Five Minor Children*, Del.Supr., 407 A.2d 198 (1979)). In addition, judicial decisions clearly indicate that termination, to be lawful, must be in the child's best interests. *Daber v. Division of Child Protective Services*, 470 A.2d at 726; *see also* 13 *Del.C.* § 722.

■ In adopting 13 *Del.C.* § 1103(5) the Delaware legislature determined that the State may initiate proceedings for the termination of parental rights where a child's parents "are not able, or have failed, to plan adequately for the child's physical needs or his mental and emotional health and development...." These criteria are concerned with basic needs of a healthy child, and clearly they deal with compelling State interest.

Additionally, under 13 *Del.C.* § 1103(5) the individual's inability to plan adequately is only one factor when determining whether to terminate parental rights. The General Assembly limited the State's authority to specific instances, *i.e.*, cases where the children are in "the care of an authorized agency," 13 *Del.C.* § 1103(5)(a), or "in the home of a stepparent or blood relative," 13 *Del.C.* § 1103(5)(b). The children in this case have been in the care of the Children's Bureau since 1983. Before the Family

Court ordered termination of parental rights it was required, by statute, to find that (1) the children had "been in the care of an authorized agency for 1 year, or [that there had been] a history of previous placement," and (2) the conditions which led to the placement of the children "still persist, and there appears to be little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future." 13 *Del. C.* § 1103(5).

Moreover, in this case the choice is not between keeping the children in temporary foster care with a reasonable expectation of reunifying the family and terminating parental rights. It is patently evident that the appellant has a serious, chronic mental illness, and that eventual family reunification is most unlikely. Thus, the choice in this case is between keeping the children in foster care for an indefinite period of time or terminating parental rights with a view to future adoption and the establishment of normal family relationships.

The appellant contends that her children are not presently subject to any immediate harm because they are already in State provided foster care homes. However, there is evidence that continuing to maintain a child in what is essentially perpetual foster case, when there is no realistic possibility of family reunification in the near future, is detrimental to the child. *See, e.g.*, Bryce and Ehlert, *144 Foster Children*, 50 Child Welfare, at 503 (1971) ("It is our conviction that no child can grow emotionally while in limbo, never really belonging to anyone except on a temporary and ill-defined or partial basis.... To grow, the child needs at least the promise of permanency in relationships and some continuity of environment."); Foster, *Adoption and Child Custody; Best Interests of the Child?*, 22 Buffalo L.Rev., at 12 (1972) (recognizing "that the psychological parent-child relationship is more important than biological parenthood.").

■ The appellant also contends that the State did not consider less extreme alternatives of attempt to aid family reunification

before it commenced proceedings for the termination of parental rights.

Under Delaware law "[p]replacement, preventive services and reunification services" for children and their families must be provided. 29 *Del.C.* § 9003(3)(b). The procedure requires a written case plan and a semi-annual review of the plan to determine it's effectiveness. 29 *Del.C.* § 9003(3) and (4). *See generally In re Burns*, 519 A.2d at 646–49 (outlining state and federal statutory schemes requiring state agencies to expend all reasonable efforts to preserve the family unit). Strict adherence to these mandates is required. *Id.* Moreover, this Court has held that when termination of parental rights is based primarily on the ground that a parent was unable to plan adequately for a child's needs "the trial court is required to make appropriate findings of fact and conclusions of law as to the State's *bona fide* efforts to meet its own obligations." *Id.* at 649.

In this case, as has been indicated, the State made several attempts to preserve the family unit. Originally, the Children's Bureau helped draw up a plan for Ms. Crane and her children which contemplated, and provided measures for, reunification of the family. After the first plan failed, the Children's Bureau created a second plan, which aimed to place the children with Ms. Crane's relatives. It was only after the second plan also failed that the Children's Bureau, in consultation with experts, determined that family reunification was not feasible and that termination of Ms. Crane's parental rights was in the best interests of the children.

The Family Court, in turn, initially ruled that the State had not met its burden of showing, by clear and convincing evidence, that the conditions which led to the children's placement could not be remedied at an early date. However, upon subsequent rehearing, at which extensive evidence was presented, the Family Court found that Ms. Crane had not made progress and that continued foster care was inappropriate for the children. Only then did it enter an order terminating Ms. Crane's parental rights. Upon review of the record, we find no error in the rulings of the Family Court.

## IV.

Lastly, Ms. Crane contends that the evidence presented at the termination hearing does not support the finding that termination of her parental rights is in the best interest of her children. We find the hearing record does not support her contention.

An important objective of 13 *Del.C.* § 1103 is to insure that children are not denied the opportunity for a stable family life and that, where possible, they avoid permanent placement in foster care. *See* 13 *Del.C.* § 1113.[3] In the case of *In re Burns*, this Court held that "[t]he statutory criteria listed in 13 *Del.C.* § 722(a) for the determination of a child's best interest in a custody action apply with equal force to a termination proceeding." *In re Burns*, 519 A.2d at 644 (citing *Daber v. Division of Child Protective Services*, 470 A.2d at 727). Therefore, in a termination proceeding, "the Court shall consider all relevant factors including: (1) The wishes of the child's parent ...; (2) The wishes of the child ...; (3) The interaction and interrelationship of the child with his parent ... and any other person who may significantly affect the child's best interests; (4) The child's adjustment to his home, school and community; and (5) The mental and physical health of all individuals involved." 13 *Del.C.* § 722(a).

As previously mentioned, there is undisputed evidence of a long history of mental illness in this case, and psychiatrists testified as to the serious nature of Ms. Crane's mental illness, and her inability to adequately take care of her children. Several experts also testified that termination of parental rights was in the best interests of the children.

---

3. 13 *Del.C.* § 1113 provides:
   This chapter is designed to achieve without undue delay the paramount objective of the best interest of the child, and all questions of interpretation shall be resolved with that objective in mind. Where there appears to be a conflict between the best interest of the parent(s) and the child, the best interest of the child shall prevail.

We are of the opinion that the evidence supports the ruling of the Family Court that the termination of Ms. Crane's parental rights is in the best interest of the children as provided for by 13 *Del.C.* § 1103. The Court's ruling is supported by clear and convincing evidence in the record as well as by inferences which are the product of an orderly and logical deductive process. *Betty J.B. v. Division of Social Services,* Del.Supr., 460 A.2d 528, 531 (1983); *Wife (J.F.V.) v. Husband (O.W.V., Jr.),* Del.Supr., 402 A.2d 1202, 1204 (1979).

The decision of the Family Court is AFFIRMED.