Dennis CARLSON, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 448, 2005.

Supreme Court of Delaware.

Submitted: May 24, 2006.
Decided: June 29, 2006.
Reargument and Rehearing
Denied July 10, 2006.

Nicole M. Walker, Esquire, Office of the Public Defender, Wilmington, Delaware, for appellant.

Elizabeth R. McFarlan, Esquire, Department of Justice, Wilmington, Delaware, for appellee.

Before HOLLAND, JACOBS and RIDGELY, Justices.

HOLLAND, Justice.

The defendant-appellant, Dennis Carlson, was indicted on thirty-one counts of the Sale of Unregistered Securities [1] and one count of Sale by an Unregistered Agent.[2] Counts 7, 24 and 25 were dismissed upon motion by Carlson's defense counsel. Following a jury trial in the Superior Court, Carlson was found guilty on all remaining counts. Defense counsel's post-trial motion to withdraw was granted.

Carlson proceeded *pro se* at sentencing. He was sentenced to seven years at Level 5 followed by probation and ordered to pay restitution. After Carlson filed an appeal, this Court remanded the matter to the Superior Court to determine whether he was indigent and entitled to representation by the Public Defender. After Carlson was found to be indigent, he was represented by the Public Defender at a resentencing on September 2, 2005. Carlson was sentenced to five and one-half years at Level 5 followed by probation and ordered to pay restitution.

Carlson has raised two issues in this appeal. First, he contends that the trial judge violated his right to a fair trial when he permitted the State to introduce an expert's legal opinion on the meaning of the term "security," as defined in the Delaware Code. Second, Carlson alleges that the Delaware Securities Act's definition of the term "security" is unconstitutionally vague and did not give him, "a man of ordinary intelligence, a fair warning of the financial instruments he was not permitted to sell without registering as a securities agent with the State."

We have concluded that both of Carlson's claims are without merit. Therefore, the judgments of the Superior Court must be affirmed.

### *Facts*

Carlson is licensed to sell insurance in Delaware. Carlson has never, however, registered to sell securities with the Delaware Securities Commissioner.[3] Carlson testified that he read trade magazines in an effort to educate himself about the insurance business.

Several years ago, Carlson contacted a purported insurance salesman, Russ Jones, and learned about the sale of promissory notes. After Carlson began to sell the promissory notes, the Delaware Attorney General's office informed Carlson that the promissory notes he was selling were securities. The Securities Division of the Delaware Department of Justice filed an administrative complaint before the Securities Commissioner of Delaware. The complaint was resolved through a civil cease and desist order whereby Carlson agreed, *inter alia*, not to offer or sell "notes, bonds, or other securities in the State of Delaware until such time as the securities are registered with the Securities Commissioner and until such time as [Carlson] is licenses to effect transactions and securities pursuant to the provisions of 6 Delaware Code Chapter 73."

Carlson testified that Jones introduced him to two other men, whom Carlson understood to be fellow insurance salesmen. The three men informed Carlson about offshore certificates of deposit ("CDs") investments with the First International Bank of Grenada ("FIBG") and preferred-stock investments with Wellington Bank and Trust Limited of Saint Georges, Grenada ("Wellington"). None of those offshore investment instruments was regis-

---

**1.** Del.Code Ann. tit. 6, § 7304.

**2.** Del.Code Ann. tit. 6, § 7313.

**3.** *See generally* Del.Code Ann. tit. 6, § 7301.

tered as securities with either Delaware or the Federal government.

According to Carlson, the three men claimed that they had visited the banks in Grenada and found them to be reputable. The men also told Carlson of high returns on their own investments. Carlson stated that he relied heavily on the representations that these men made to him. Carlson testified that he "had absolutely no expertise in the area of off-shore investments and was ignorant of international law." Carlson also testified that he studied a book entitled "Offshore Money Book," visited FIBG's website, made phone calls, attended seminars, read the banks' publications and contacted the International Deposit Insurance Company ("IDIC").

Carlson conducted his insurance business under the name A Plus Financial. He placed an investment advertisement in a Delaware publication, *Better Years*. The advertisement did not mention either FIBG or Wellington. As a licensed insurance salesman, Carlson was authorized to sell certain forms of annuities and viaticals.[4] When he spoke to individuals about various investments, including the annuities and viaticals, Carlson often mentioned the Grenada CDs and Wellington preferred stock.

In November 2000, as part of a routine investigation, Investment–Advisor Examiner Robert Gouge discovered an advertisement in the investment section of the Yellow Pages for A Plus Financial Services on Concord Pike in New Castle County. Gouge visited the business to see what kind of services A Plus was marketing. Carlson indicated that he was offering insurance products, not investment products. Carlson explained that the Yellow Pages advertisement was a mistake and that he was not supposed to be listed in that particular category because he was only offering insurance products. Carlson also informed Gouge that he did not do any advertising as his business was all by word of mouth.

In February 2001, Gouge met with Lillian Vanderwende, a seventy-year-old widow, who had lodged a complaint against Carlson. Vanderwende had responded to an advertisement in *Better Years*, a magazine for seniors, in May 1999. The advertisement offered an investment that was 100% insured with no market risk, and quoted *The Wall Street Journal* and *Newsweek* in reference to the investment. There was no business name or agent's name listed in the advertisement—only an 800 number to call. When Vanderwende called the 800 number, Carlson answered the phone.

Carlson went to Vanderwende's home in Houston, Delaware, to discuss investment opportunities. One of the opportunities Carlson presented to Vanderwende involved an investment in Wellington Bank and Trust. At a second meeting, Carlson filled out the application for Vanderwende to sign. Vanderwende wrote a check to Wellington for $35,000, from her retirement savings, and gave that check to Carlson. Vanderwende understood that she was to receive $1,022 per month for ten years on her $35,000 investment, a 35% annual percentage rate. Vanderwende received eight payments before the payments stopped completely. Vanderwende never recovered her initial investment or any additional interest, nor did she receive any insurance payment as a result of her loss.

---

**4.** "A viatical settlement contract [...] includes a contract for a loan or other financial transaction secured primarily by an individual or group life insurance policy, other than a loan by a life insurance company pursuant to the terms of the life insurance contract, or a loan secured by the cash value of a policy." Del.Code Ann. tit. 18, § 7502.

Some investors who responded to the advertisements in *Better Years* or were otherwise referred to Carlson, invested in certificates of deposit from the First International Bank of Grenada ("FIBG"). Others invested in preferred stock of Franklin Capital Holdings or another Wellington company through Carlson. All the investors were told that their investments were secure because they were insured through the IDIC, allegedly an organization similar to the FDIC, which insures deposits in American banks.

Carlson assisted in filling out the applications and accepted the checks from the investors. Carlson was listed as an "investment counselor" on the beneficiary designation form from FIBG. Carlson also had the investors write and send non-solicitation letters, copying wording he provided. Eleven individuals testified at trial that they had invested in an offshore instrument through Carlson and lost an aggregate of approximately $400,000.

### *Expert Testimony—No Plain Error*

■ For the first time on appeal, Carlson contends that Royce Griffin should not have been allowed to testify for the State as an expert witness concerning what constitutes a security under Delaware law. Because no objection was made at trial, that contention must be reviewed for plain error. Under the plain error standard of appellate review, the alleged error must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process.[5]

The State called two expert witnesses to testify at trial, William Kerr and Royce Griffin. The purpose of their testimony was to assist the jury in understanding why the off-shore certificates of deposit and preferred stock investments offered by Carlson were deemed to be securities under Delaware law. Carlson's attorney initially objected to the admission of Kerr's testimony. After consulting with Carlson, however, that objection was withdrawn.

No objection, however, was made to the State's calling of Royce Griffin to testify as an expert witness. The record reflects Carlson's attorney stated that: "The first witness [Griffin], I have no problem with, assuming that he knows Delaware law and he can determine whether or not, under Delaware law, these two instruments, the certificate of deposit and the preferred stock, are—."

Carlson's defense at trial was that he did not know the offshore investments were securities. At the request of Carlson's attorney, the trial judge instructed the jury on Carlson's Mistake–of–Fact defense. Carlson's attorney argued to the jury that Carlson's mistaken belief that the offshore instruments were not securities was understandable because—after all—the State found it necessary to call an expert witness with significant credentials to explain the definition of the term security. That defense is repeated on appeal in Carlson's opening brief:

> Carlson was convicted, in part, on the legal opinion of Royce Griffin, an attorney hired by the State. The knowledge of this Harvard-educated legal scholar was hardly matched by the naivety of the financially-unsophisticated Carlson. The attorney-scholar gave the jury his legal interpretation of the subtleties in the world of securities law. Unfortunately for Carlson, he did not have the benefit of this attorney-scholar's legal opinion prior to making referrals to the FIBG and Wellington banks.

The plain error standard of appellate review generally involves an act or omission at trial. In this case, the record does not reflect inaction. To the contrary, it

---

5. *Wainwright v. State,* 504 A.2d 1096, 1100 (Del.1986).

demonstrates an affirmative decision by Carlson's attorney not to object at trial to the testimony of the State's expert witness, Royce Griffin. That decision appears to have been strategic and consistent with Carlson's defense that he mistakenly thought the offshore investment instruments were not securities under Delaware law because the statute was so complicated that only an attorney could understand it. We hold there was no plain error by the trial judge's decision not to deny Carlson, *sua sponte*, the effective assistance of his trial counsel's defense strategy.

### Securities' Statute Provides Fair Notice

 Carlson contends that the statutory definition of "security" is unconstitutionally vague as applied to him. As a result, Carlson claims that he was not given fair notice that it was illegal to sell FIBG certificates of deposit and Wellington stock without registering to sell securities. "[T]he void for vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."[6] To prevail on his claim of unconstitutional vagueness, Carlson must show that the statute is vague as applied to his own conduct.[7]

The State submits multiple examples of evidence in the record that establish why Carlson failed to demonstrate that the statute was vague as to his own conduct. First, Carlson was a licensed insurance agent who knew that he was not permitted to sell securities. Second, he had voluntarily signed a cease and desist order agreeing not to sell unregistered securities. Third, Carlson testified that he believed the Grenadian certificates of deposit were exempt from registration because domestic certificates of deposit were exempted. Finally, Carlson's behavior exhibited knowledge that he should not have been selling the offshore products for the following reasons: Although Carlson denied advertising that he was selling investments, he placed blind advertisements without his name or the name of his business in the advertisements. Carlson's name and business were not mentioned in the recording that potential customers reached when they called the number listed in the advertisement. Carlson asked investors to copy a non-solicitation letter he had drafted and to send that letter to Wellington. Carlson had two sets of business cards, one set including reference to high-yield investments and the other without any reference to investments.

The definition of "security" in section 7302(a)(17) provides notice of the types of investment instruments to which the Delaware Securities Act applies. "Security" means:

any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate or subscription; transferable share; investment contract, including pyramid promotion which includes any plan or operation for the sale or distribution of property, services, or any other thing of value wherein a person for a consideration is offered an opportunity to obtain a benefit which is based in whole or in part on the inducement, by himself or herself or by others, of addi-

6. *Grace v. State*, 658 A.2d 1011, 1015 (Del. 1995) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)) (internal quotations omitted).

7. *See In re Hanks*, 553 A.2d 1171, 1176 (Del. 1989) (quoting *Aiello v. City of Wilmington*, 623 F.2d 845, 850 (3d Cir.1980)).

tional persons to purchase the same or a similar opportunity; voting-trust certificate; certificate of deposit for a security; certificate of interest of participation in an oil, gas or mining title or lease or in payments out of production under such a title or lease; options on commodities; or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate, for, receipt for guarantee of, or warrant or right to subscribe to or purchase, any of the aforegoing. "Security" does not include any insurance or endowment policy or annuity contract under which an insurance company promises to pay money either in a lump sum or periodically for life or for some other specified period.[8]

Section 7304 provides that *all* securities must be registered unless exempted under the Act. Section 7309 lists the exemptions. There is no reason to believe that an "ordinary person" cannot ascertain and understand the meaning of the term "stock." The meaning of "certificate of deposit" is equally comprehensible by an ordinary person. Certificates of deposit are specifically referenced in section 7309 as being exempt only when issued or guaranteed by the United States or a local government in the United States.[9]

We hold that the Delaware definition of securities in the Delaware Securities Act is not vague. Other jurisdiction with similar statutory definitions of security have found no vagueness problems.[10] The Delaware statute provided Carlson with fair notice

that the offshore investment opportunities he was offering were securities under Delaware law and that the sale of those unregistered securities was illegal.

### Conclusion

The judgments of the Superior Court are affirmed.

---

8. Del.Code Ann. tit. 6, § 7302(a)(17).

9. *See* Del.Code Ann. tit. 6, § 7309(a)(1).

10. *See e.g., State v. Ramos,* 116 N.M. 123, 860 P.2d 765, 769–70 (1993) (finding no vagueness problem in definition of "security" and noting that "[o]ur conclusion is further buttressed by decisions of courts in other ju-

risdictions that have upheld similar state securities legislation against constitutional challenges based on allegations of vagueness" (collecting cases)). *See also United States v. Tehan,* 9 Ohio Misc. 135, 365 F.2d 191, 198 (6th Cir.1966); *Armstrong v. State,* 811 P.2d 593, 598 (Okla.Crim.App.1991). *Szpunar v. State,* 783 N.E.2d 1213, 1220 (Ind. Ct.App.2003).