**Melanie HARPER, Respondent Below, Appellant,**

v.

**DIVISION OF FAMILY SERVICES and Office of the Child Advocate, Petitioners Below, Appellees.**

No. 30, 2008.

Supreme Court of Delaware.

Submitted:  June 11, 2008.
Decided:  June 30, 2008.

Margaret R. Cooper, Esquire, Fuqua and Yori, P.A., Georgetown, Delaware, for appellant.

Kathryn L. Welch, Esquire, Department of Justice, Georgetown, Delaware, for appellee.

Heather Williams, Esquire, Office of the Child Advocate, Georgetown, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND and JACOBS, Justices.

HOLLAND, Justice.

Melanie Harper (the "Mother"), birth mother of Dijonaha Harper [1] ("Child"), appeals from a Family Court decision terminating her parental rights and transferring them to the Division of Family Services of the Department of Services for Children, Youth, and Their Families ("DFS"). On appeal, the Mother argues that the trial court erred in concluding that DFS proved by clear and convincing evidence: first, that the Mother failed to plan for the Child; and, second, that terminating parental rights was in the Child's best interest. We have concluded that both arguments are without merit. Therefore, the

---

1. The Court has assigned pseudonyms to the Mother and Child pursuant to Supreme Court Rule 7(d).

judgment of the Family Court must be affirmed.

### Facts

The Child was born on November 15, 2005. She was twenty-six weeks premature and had multiple health defects, particularly a hole in her heart and sleep apnea, all of which required constant monitoring. Because of the Child's poor health and the perceived inabilities of the Mother to provide adequate care for the Child, the hospital staff notified DFS, who filed an emergency petition on January 9, 2006 for temporary custody of the Child. An Emergency Order was granted and a preliminary protective hearing was scheduled for January 23, 2006. After that hearing, the Family Court ordered that the Child remain in DFS' custody. Upon leaving the hospital, the Child was placed with a foster family, where she remained throughout the Family Court proceedings.

On April 17, 2006, the Family Court held an adjudicatory hearing regarding custody of the Child. During that hearing, the Mother agreed that she "need[ed] to develop parenting skills." The Family Court ruled that it continued to be in the best interest of the Child to remain in DFS' custody and that it would be "contrary to the [C]hild's general welfare and safety to be returned to [M]other at this time."

A dispositional review hearing was held on for May 8, 2006.[2] The record of that hearing indicates that the Mother entered into a court-approved case plan, which consisted of six steps towards reunification with the Child. In addition to one sixty-minute visit per week with the Child, the Mother had to satisfy the following case plan components: obtain employment or other income to provide for the family's basic needs; ensure that the child would receive appropriate medical care and immunizations; undergo substance abuse evaluations and treatment; undergo a problem solving and coping skills program; cooperate in analyzing what mental health issues the Mother might have, including psychological and psychiatric evaluations; and do nothing to jeopardize her housing status.

The Mother appeared before the Family Court on August 7, 2006, and again on November 13, 2006 for review hearings regarding her progress on the case plan. After each hearing the Family Court determined that, despite the Mother's efforts to succeed in her case plan, there remained a general concern about the Mother's ability to care for the Child independently. Therefore, the Family Court held, it would be in the Child's best interest to remain in DFS' custody and care.

The Family Court noted that the Mother had made substantial steps such as retaining a rent-free apartment in government-provided housing, refraining from substance abuse, and acquiring Medicaid, food stamps, and general assistance that contributed to her income. The Mother had also been seeing a counselor and tak-

---

**2.** The purported father of the Child ("Father"), was not present for the proceedings on January 23 or April 17. At the time of the May 8 hearing, Father was incarcerated, but he denied being the father of the Child. He first appeared before the Family Court on August 7, 2006 and was instructed to have blood taken for genetic testing. Father did not comply and the court issued a capias for his arrest on October 16, 2006. On February 26, 2007, after the Division had changed its goal from reunification to termination of the Mother's parental rights, the court, in order to resolve all custody matters at once, halted the hearing until it received the results of Father's genetic testing. By April 16, 2007, the court still had not received the test results but allowed the hearing to proceed. Those results later proved that Father was, indeed, the father of the Child. At a hearing on September 17, 2007, Father consented to the termination of his parental rights.

ing medication prescribed by her psychiatrist. The Family Court expressed concerns, however, about the Mother's lack of close friends or relatives who could serve as a support system, her dependency on DFS for transportation, and her continuing mental health problems. Although the Mother had improved in her interaction with the Child, she had to be frequently reminded of basic childcare techniques, and was not allowed to have unsupervised contact with the Child.

On January 10, 2007, DFS moved to establish a permanency plan, changing the goal from reunification of the Mother and Child to termination of parental rights, followed by adoption. At the permanency hearing which began on April 16, 2007, Dr. Joseph Nadel testified that he administered the Minnesota Multiphasic Inventory II Test (MMPI II) to the Mother, and observed "several severe elevations of certain clinical scales, including suicidal ideation." Dr. Nadel also testified that "Mother spoke to him about having hallucinations, and that she heard voices, and ... also suffered from delusion that evil spirits were possessing her. He described the Mother as demonstrating manic excitability, having a poor ability to make appropriate decisions, and demonstrating difficulty concentrating."[3]

Eleasha Purnell and Doralene Davis testified about the Mother's progress in completing a program that teaches parents how to interact with their children. The witnesses stated that although most parents are able to complete the exercise at a rate of one module per week, the Mother had only finished three modules over twelve weeks. The witnesses also questioned whether the Mother had retained and understood the information contained in the modules. They testified that although the Mother had shown improvement and enthusiasm in her program, it would not be in the Child's best interest to go back to the Mother's care.

Specifically, the Mother's case manager, Doralene Davis, testified that that "Mother did not have the conscious ability to keep the child safe due to her forgetfulness, inability to move quickly, over-extended finances, [and] the continued need to be prompted on basic parenting skills," especially given the "serious medical issues [the][C]hild has." The Mother herself testified that she would not be able to care for the Child without DFS' aid. Additionally, the Family Court heard testimony from the foster mother, Faye Prigge, who reported that the Child was healthy and attached to the foster care family. Prigge also testified that she would like to adopt the Child.

In reaching its conclusion to approve the change from reunification to termination of parental rights, the Family Court emphasized that the Mother "is a very nice person who has given her best effort in cooperating with [DFS] so that she can be reunified with her child." The Family Court determined, however, that the Mother's success fell far short of what would be sufficient to achieve reunification, and that "Mother does not have the capability, even after all of this time, to provide th[e][C]hild with an environment and care that will, even at minimum, keep th[e][C]hild safe and healthy, let alone provide ... an environment in which the [C]hild can flourish in the future."

The Family Court found that DFS had made reasonable efforts to reunite the

---

**3.** The Family Court also heard testimony from Karen McGroerty, a counselor who met with the Mother on an average of two times per month. McGroerty noted improvement in the Mother's mood and responsiveness, but also stated that the Mother had recurring hallucinations.

Mother with the Child, but that the best interests of the Child dictated that DFS be allowed to move for termination of parental rights. DFS filed such a motion and, by order dated December 17, 2007, the Family Court terminated the Mother's parental rights. This appeal followed.

### Clear and Convincing Evidence

■ The Mother first claims that the Family Court erred in concluding that the State had proven by clear and convincing evidence that the Mother had failed to plan for the Child's "physical needs or mental and emotional health and development," as required under Title 13, section 1103 of the Delaware Code.[4] The requirements of section 1103 must be proven by clear and convincing evidence.[5] On appeal from a Family Court judgment, this Court reviews the facts and the law, as well as the inferences and deductions made by the Family Court.[6] If the law was correctly applied, determinations regarding termination of parental rights are reviewed for an abuse of discretion.[7] We will not disturb findings of fact unless they are clearly wrong.[8]

■ The Mother argues that, to show that she was planning for the Child so that they could be reunified, she had to complete her case plan. The Mother claims that the evidence indicates that she did so, and that the Family Court's reluctance to return the Child was due to a general feeling that her mental health issues and cognitive limitations would prevent the Mother from providing adequate care for the Child. Such concerns should have been analyzed, the Mother argues, under Section 1103(a)(3), not 1103(a)(5) as the Family Court did. Section 1103(a)(3) allows for termination where "[t]he parent . . . [is] found by the Court to be mentally incompetent and, from evidence of 2 qualified psychiatrists . . . found to be unable to discharge parental responsibilities in the foreseeable future." [9]

The Family Court's consideration of the Mother's mental health was proper under either Section 1103(a)(3) or 1103(a)(5). Those two provisions are not mutually ex-

---

4. The relevant part of Title 13, section 1103 of the Delaware Code states:

(a) The procedure for termination of parental rights for the purpose of adoption . . . may be initiated whenever it appears to be in the child's best interest and that 1 or more of the following grounds exist: [ . . . ]

(3) The parent . . . [is] found by the Court to be mentally incompetent and, from evidence of 2 qualified psychiatrists selected by the Court, found to be unable to discharge parental responsibilities in the foreseeable future. . . .

\* \* \*

(5) The parent . . . [is] not able, or [has] failed, to plan adequately for the child's physical needs or mental and emotional health and development, and 1 or more of the following conditions are met:

(a) In the case of a child in the care of the Department or a licensed agency:

(1) The child has been in the care of the Department or a licensed agency for a period of 1 year, or for period of 6 months in the case of a child who comes into care as an infant . . . ; or

\* \* \*

(5) The failure to terminate the relationship of parent and child will result in continued emotional instability or physical risk to the child.

5. *In re Hanks,* 553 A.2d 1171, 1178 (Del. 1989).

6. *Wife (J.F.V.) v. Husband (O.W.V., Jr.),* 402 A.2d 1202, 1204 (Del.1979).

7. *Russell v. Stevens,* 2007 WL 3215667, at \*2 (Del.Supr.) (citations omitted).

8. *Montgomery Cellular Holding Co. v. Dobler,* 880 A.2d 206, 219 (Del.2005).

9. Del.Code Ann. tit. 13, § 103(a)(3).

clusive. The need for supporting evidence of two psychiatrists was not necessary, however, because the Family Court made no determination that the Mother was "mentally incompetent" (Section 1103(a)(3)), but merely that the Mother's mental health problems demonstrated that she was "not able ... to plan adequately for [her][C]hild" (Section 1103(a)(5)). The Family Court found that "Mother's limitations which existed at the time of the child's birth, continue to exist with little likelihood that [they] would be remedied at any early date which would allow Mother to discharge her parental responsibilities." [10]

Section 1103(a)(5)(a)(5)(A) provides that a relevant inquiry is "[w]hether the conditions ... continue to exist and there appears to be little likelihood that these conditions will be remedied at an early date which would enable the respondent to discharge parental responsibilities." [11] The language employed by the Family Court in its analysis replicates the language of Section 1103(a)(5)(a)(5)(A). Therefore, there is no doubt that the Family Court was referring to Section 1103(a)(5) in its analysis of the Mother's mental health, and evidence from two psychiatrists was not legally required.

█ Moreover, the Mother's assertion that she completed her case plan is contrary to the evidence of record. Under the case plan the Mother was required to obtain income to provide for herself and the Child, to cooperate with the Child's medical care providers, to refrain from substance abuse, to complete a problem solving and parenting program, to take control of her mental health issues, and not do anything to jeopardize her housing

status. The record shows that the Family Court correctly found that the Mother had not completed her case plan.

The only elements of the Mother's case plan that clearly had been completed were the Mother's cooperating with the Child's medical care providers and her avoidance of substance abuse. The record reveals that the Mother was stretched thin financially—a fact that the Mother's own testimony substantiated. Those who worked with the Mother throughout her parenting skills program testified that she was not completing the modules at a reasonable rate, and in those modules that she did complete the information likely was not retained. The record also shows that the Mother was jeopardizing her government-subsidized housing at the time of the December 2007 hearing by allowing her pregnant cousin to live with her. The Family Court further noted the Mother's continued mental health problems: "[T]here is clear and convincing evidence that the State has met its burden of proof in that this mother is not able, and has failed to plan due to her mental and emotional limitations." Therefore, the Family Court's conclusion that the Mother did not fulfill the requirements of her case plan is not clearly wrong.

Besides establishing that the Mother had failed to plan for the Child, the State also had to prove by clear and convincing evidence that one or more of the conditions of Section 1103(a)(5)(a) were satisfied. The Family Court held that Sections 1103(a)(5)(a)(1) and (5) were both satisfied. We need not determine whether the conditions of subsection (5) were met, because the statute only requires that one condi-

10. Decision and Order of the Family Court, dated Dec. 17, 2007 (hereafter "Family Ct. Decision"), at p. 12 (internal citation omitted).

11. Del.Code Ann. tit. 13, § 1103(a)(5)(a)(5)(A).

tion be satisfied,[12] and subsection (1), regarding the Child's length of duration in DFS' custody, clearly was met. Therefore, the Family Court correctly found that at least one statutory ground existed for termination of parental rights under Title 13, section 1103.

### Child's Best Interests

■ Under Delaware law, once the State has satisfied one of the enumerated statutory grounds for termination under section 1103, it must prove that termination of parental rights is in the best interests of the Child, pursuant to Title 13, section 722 of the Delaware Code. The Mother's second claim is that the Family Court erred in concluding that the State had proven by clear and convincing evidence that terminating the Mother's parental rights was in the best interests of the Child under section 722.[13] The Mother makes two separate arguments. First, she argues that the Family Court erred by not separately and expressly analyzing each of the factors set forth in section 722. Second, she claims that because the foster mother stated that she would allow continuing contact between the Mother and the Child if the Mother's parental rights were terminated, termination cannot be in the best interest of the Child. Both arguments lack merit. Section 722 states that "[i]n determining the best interests of the child, the Court shall *consider* all relevant factors."[14] Section 722 does not require the Family Court to articulate a step-by-step analysis. The Family Court independently discussed five of the eight factors set forth in section 722. The three factors to which the Family Court did not draw particular attention (the wishes of the child's parents, the wishes of the child, and compliance with the requirements of Title 13, section 701 of the Delaware Code), were not as pertinent here as were the factors relating to the Child's adjustment and interaction with the foster family, and the health and background of the foster family. Therefore, the Family Court's analysis of the factors under section 722 was not an abuse of discretion.

■ The Mother's second argument is also without merit. The fact that the foster mother will continue to allow the Mother to visit the Child does not support the Mother's opposition to termination of her parental rights. Visiting a child and rearing one are different acts entailing different responsibilities. The record supports the Family Court's conclusion that the Mother's financial and cognitive limitations prevent her from protecting and providing

---

**12.** Del.Code Ann. tit. 13, § 1103(a)(5) requires that "[one] or more of the following conditions [be] met."

**13.** Del.Code Ann. tit. 13, § 722(a) provides:

(a) The Court shall ... consider all relevant factors including:

(1) The wishes of the child's parent or parents as to his or her custody and residential arrangements;

(2) The wishes of the child as to his or her custodian(s) and residential arrangements;

(3) The interaction and interrelationship of the child with his or her parents ... and any other residents of the household or persons who may significantly affect the child's best interests;

(4) The child's adjustment to his or her home, school and community;

(5) The mental and physical health of all individuals involved;

(6) Past and present compliance by both parents with their rights and responsibilities to their child under § 701 of this title;

(7) Evidence of domestic violence as provided for in Chapter 7A of this title; and

(8) The criminal history of any party or any other resident of the household including whether the criminal history contains pleas of guilty or no contest or a conviction of a criminal offense.

**14.** Del.Code Ann. tit. 13, § 722 (*emphasis* added).

for the Child on a permanent, independent basis.

### Conclusion

The judgment of the Family Court is AFFIRMED.