DIVISION OF FAMILY SERVICES,
Petitioner,

and

Lester Newman, Petitioner,

v.

Richard NEWMAN, and Catherine Lawson, Respondents.

In the Interest of Oscar Newman DOB: [Redacted].

File Nos. 09–03–02TS, CS08–02416. Petition Nos. 09–07699, 08–21532.

Family Court of Delaware, Sussex County.

Submitted: Aug. 10 and 13, 2009. Decided: Sept. 23, 2009.

James Reichert, Esquire, Delaware Department of Justice, Georgetown, DE, Attorney for the Division of Family Services.

David Hutt, Esquire, Law Office of Wilson, Halbrook, and Bayard, P.A., Georgetown, DE, Attorney for Richard Newman.

Patricia O'Neill, Esquire, Law Office of Patricia M. O'Neil, Esquire, Georgetown, DE, Attorney for Catherine Lawson.

Kristin Gibbons, Esquire, Office of the Child Advocate, Georgetown, DE, Attorney for the Court Appointed Special Advocate (CASA).

## OPINION

HENRIKSEN, J.

Pending before the Court are two matters which were consolidated into one hearing. The first matter involves the guardianship petition of the above-named minor child's paternal grandfather, Lester Newman.[1] The second petition was filed by the Division of Family Services, the Department of Services for Children, Youth, and Their Families ("DFS" or "the Division"). The Division's petition seeks the termination of the parental rights of Richard Newman ("Father") and Catherine Lawson ("Mother") in their now 3-year-old son, Oscar.

## BACKGROUND

Oscar Newman ("Child") was born May 23, 2006. For the first year and a half of the child's life, he basically resided in the home of his paternal grandfather, Lester Newman, along with his maternal grandmother, Dinah Dougherty. Although not married, the relationship between Paternal Grandfather and Maternal Grandmother was intimate. During much of the child's first year and a half of life, his unmarried

parents also lived together under the same roof with these grandparents.

The child then came into DFS care on December 04, 2007. The Court granted emergency custody to DFS when Maternal Grandmother filed for emergency guardianship of the child. Maternal Grandmother's petition alleged that the parents were on drugs, stealing from the grandparents, and were not providing appropriate care for the child. Maternal Grandmother's original petition also alleged that both parents were incarcerated.

The Court was prepared to go forward with a Preliminary Protective Hearing on December 10, 2007. Since neither parent had been served, neither parent appeared. However, Paternal Grandfather and Maternal Grandmother appeared together at the hearing. They indicated that they were living together. They also indicated an understanding that the guardianship petition had been filed by both of them, when in fact the petition was filed only in the name of Maternal Grandmother. The Court's Order of December 10, 2007, maintained custody of the child with the Division of Family Services. The Division kept the child in the home of Maternal Grandmother and Paternal Grandfather.

On December 14, 2007, the Court appointed JoAnn Paulson, a Court appointed special advocate, as guardian *ad litem* for the child.

On February 04, 2008, both parents appeared for the rescheduled Preliminary Protective Hearing. The Court found Mother to be indigent and appointed Margaret Cooper, Esquire as her attorney. The child's father also appeared, but the Court was unable to appoint counsel at this hearing for Father. Although con-

---

1. Pseudonyms have been substituted for the names of the parties pursuant to Supreme Court Rule 7(d).

tract attorney Ashley Oland, Esquire was present, she had a conflict representing Father. At this initial stage of the process, the Division was prepared to rescind its custody to the guardianship of Maternal Grandmother and Paternal Grandfather. However, Mother was opposed. Instead, Mother waived both her Preliminary Protective Hearing and her Adjudicatory Hearing, it being the understanding that the basis of the child's dependency with Mother was her drug use, lack of employment, and lack of housing. The Division continued to keep the child in the care of Maternal Grandmother and Paternal Grandfather. Because Father did not have counsel available at this stage of the proceedings, his Preliminary Protective Hearing was continued.

On February 12, 2008, the Court appointed Dennis Schrader, Esquire to represent Father.

The Court held its next hearing on April 21, 2008. Father appeared along with his Court appointed attorney, David Hutt, Esquire, who is an associate with Dennis Schrader, Esquire. Mother appeared along with her attorney, Margaret Cooper, Esquire. At the time of this hearing, Mother was incarcerated on a recent violation of probation and recent additional criminal charges. Both Paternal Grandfather and Maternal Grandmother were also present for the hearing. Father waived both his Preliminary Protective Hearing and Adjudicatory Hearing on the basis of his lack of employment, inadequate housing, and concerns with substance abuse and domestic violence. Father had previously signed a case plan with the Division, and an unsigned copy of the plan had been previously submitted into the Court's file. At this hearing, the Court also learned that Mother and Father were both recently charged with Theft less than $1,000 and Conspiracy, and the trial was scheduled for July 08, 2008. All parties present at this hearing agreed that temporary placement of the child should remain with the grandparents. The Division still retained custody. The Division entered into a safety plan with the grandparents which specified very clearly that each parent was to get weekly visits which must be arranged through the Division worker, and that neither parent would be permitted to go directly to the home of the grandparents. The safety plan was necessitated by an earlier incident when Maternal Grandmother had to call the police on Father. The Court admonished all parties at this hearing to require the Division's rules be followed. The Court especially noted the prior history of domestic violence involving these parties, and cautioned that, if permitted to continue, this behavior could cause serious and irreparable mental harm to this child.

Father's case plan was reviewed during the April 21, 2008 hearing. It required Father to obtain employment and to take a parenting class or produce a certificate of completion of such a class which had been completed no longer than a year prior to the date of the hearing. Father also needed to arrange for courses in domestic violence. Father noted that he was already working with Kent Sussex Counseling on substance abuse issues, and he would be obtaining his mental health evaluation at Kent Sussex Counseling. Father also needed to obtain separate suitable housing.

At the hearing on April 21, 2008, the Court found of particular interest the Division's observations that the child had a close relationship with his grandparents, and an evaluation by Child Development Watch which demonstrated that the child showed no particular concerns. This information is particularly relevant to the guardianship petition pursued by Paternal Grandfather.

The Court's Order of April 21, 2008, describes in detail the criminal histories of the parents. The Court noted the pending charges of Theft and Conspiracy in the 3rd Degree for the arrest of both parents which occurred on April 09, 2008. Both parents were also arrested on December 01, 2007, for domestic related incidences against Paternal Grandfather. Paternal Grandfather eventually dropped the charges. On December 24, 2006, both parents were arrested on numerous domestic related drug charges to which both of them eventually pled guilty to some of the charges. On December 23, 2003, Father was charged with various incidences of domestic violence against Mother to which he eventually entered a guilty plea. Just prior to that, Father was arrested for various charges in which Mother was also the victim. Father eventually pled guilty to Domestic Violence related Assault in the 3rd Degree. For events which occurred on January 27, 2003, Father, as well as Paternal Grandfather and Maternal Grandmother all were involved in an offense when the grandparents were less than forthright with the investigating police when they refused to disclose the whereabouts of Father, who was hiding in the closet of their home with the then underage Mother. For events which occurred on January 10, 2003, Father pled guilty to Terroristic Threatening and Assault in the 3rd Degree in which Mother was again the victim. On December 15, 2003, following a domestic related incident, Father was placed into Rockford for a mental evaluation. For events which occurred on November 23, 1998, while Father was a juvenile, he entered a plea of guilty to a domestic related incident of Criminal Mischief.

The Court's Order of April 21, 2008, concluded that the Division was making reasonable efforts towards reunification of the child with one or both of the parents. The Court's Order recognized that both parents were seeking reunification. The Court also found the Division was making reasonable efforts to make a concurrent plan with the possible award of guardianship to Maternal Grandmother. The Court also noted concerns driven by a considerable history of domestic violence in the grandparents' household between the parents.

As the Court does in all of these dependency/neglect cases where a parent is seeking reunification, unless all parents consent to the guardianship, a guardianship petition is held in abeyance so long as the parents are entitled to have reasonable efforts afforded to them for reunification. At the same time, where the guardianship petitioners, as in this case, are grandparents, they are invited to attend all dependency hearings.

The next hearing occurred on July 14, 2008. It was at this hearing that the Court learned of a major change of circumstances in this case. Up until this time, the Division of Family Services, although having custody, was content to have the child placed in the home of Maternal Grandmother and Paternal Grandfather. However, on May 21, 2008, the Division removed the child from Paternal Grandfather's care at a time when Maternal Grandmother was hospitalized. It was around this date that Maternal Grandmother left Paternal Grandfather. She shared with the Division that she and Paternal Grandfather had resided together for approximately 8 years. Maternal Grandmother indicated that she suffers from Multiple Sclerosis. She is now living with Mother's biological father, Edward Lawson. Most importantly, Maternal Grandmother alleged that Paternal Grandfather exercised abusive control over her and other family members throughout their relationship.

The Court noted in its Order of July 14, 2008, that, despite Maternal Grandmother's allegations that she had been a victim of Paternal Grandfather's domestic violence and control, there was nothing in Paternal Grandfather's criminal history in Delaware to reflect any acts of abuse or violence for which Paternal Grandfather was ever arrested or convicted. Also, there was no clear proof provided by Maternal Grandmother, such as hospital records, or the testimony of others, to support her allegations. DFS worker Ronnet McKenzie acknowledged that the primary caretaker for the child had always been Paternal Grandfather. The absence or inability of the parents to care for the child together with Maternal Grandmother's ill health placed Paternal Grandfather in the position of having the primary duties for taking care of the child. DFS worker McKenzie also testified that the child did not appear afraid when the child was with his paternal grandfather.

Having forcibly removed the child from Paternal Grandfather's care, using police assistance, and placing the child into a foster home, DFS worker McKenzie then noted that the child appeared to be afraid when visitors came to see him at the foster home, and the child quite often needed to be held. DFS worker McKenzie testified that Paternal Grandfather was less than cooperative at subsequent attempts at visitation, and he acted verbally hostile towards DFS worker McKenzie. Eventually, Ms. McKenzie was unwilling to supervise further visits between the child and Paternal Grandfather. Although the Court's Order reflects that Paternal Grandfather should have been more cooperative with the Division workers, the Court also noted it empathized somewhat with Paternal Grandfather's reaction after the child had been forcibly removed from his care.

As of the hearing on July 14, 2008, the Division was unwilling to allow visits by Paternal Grandfather unless they were supervised at the Milford Visitation Center. The Division was willing to allow Maternal Grandmother to have visits. Mother was incarcerated in the Crest Program next to Baylor Detention Center in Wilmington, Delaware. She would be there for at least the next six to nine months. Wilmington, Delaware is approximately 1 ½ hours of travel time from where the other parties in this case lived and worked.

The Court continued in the July 14, 2008 hearing by reviewing each of the parents' progress on their case plans wherein they were seeking reunification. As a result of Mother's incarceration, she remained unemployed. Father had been employed for one and a half weeks at a chicken factory. However, Father decided to quit his job on July 10, 2008, because he found the work to be too hard and not paying enough money. The Court understood that Mother would be able to attend a parenting class in prison. Father completed his parenting class with Child, Inc. Mother could also get domestic violence victim's counseling in prison. The Court also noted Mother may be required to have perpetrator's domestic violence counseling based upon a review of her criminal history. Father indicated that he would be attending his domestic violence perpetrator's counseling orientation on July 15, 2008, with Patricia Boyce at Comprehensive Counseling Services. Mother could get her substance abuse counseling while incarcerated in the Crest Program. Father testified that he had been attending substance abuse counseling with Mr. Cheetwood at Kent Sussex Counseling in Georgetown. Father indicated he began those sessions in March of 2008. Mother had not yet had her mental health evaluation, nor had Father. However, DFS had done a referral for Father to Adult Mental Health. Father had still

not found suitable housing. At the time of this hearing, it was likely that Father was living with his own grandfather, Wilber Newman. The biggest plus for Father was that his visits with his son had been regular, frequent, and gone well. Mother failed to attend the first visit that was scheduled between herself and the child, and she was incarcerated shortly thereafter.

Based upon DFS worker McKenzie's observation of the negative changes this child demonstrated after having been removed from the grandparents' home and placed into foster care, she referred the child for a second Child Development Watch evaluation. The Division made a referral of the child to Stewart Johnson, a child psychologist specialist, to begin play therapy in July 2008.

The Court's Order of July 14, 2008, concluded by noting many unresolved questions concerning the safety and best interests of the child. The Court was especially interested in the dramatic changes recently noted in the child, wondered what effects, if any, the child's exposure to domestic violence had had on the child, and also wondered whether the child's dramatic changes were simply a result of being separated from his paternal grandfather, the child's primary caregiver since birth.

Finally, at the conclusion of the hearing of July 14, 2008, noting the rising complexity of the interaction between the grandparents and the allegations which were surfacing against their ability to care for the child, the Court encouraged each grandparent to seek legal counsel, noting that the Court did not have the authority to appoint legal counsel for them.

The Court briefly notes that Paternal Grandfather filed his own separate guardianship petition on June 30, 2008. As his reason for filing the petition, Paternal Grandfather indicated that the child's parents agreed that he should become the guardian of the child. However, absent from Grandfather's petition were the required consents of the parents. The Division and the CASA would also have had to consent at this time. Paternal Grandfather's guardianship petition alleged that the child was well taken care of by him, and he was the primary caretaker for the child. Paternal Grandfather averred in his petition that the child was developmentally where he should be, and he was a good and happy child. Paternal Grandfather noted his observation that the child was no longer happy as a result of having been separated from Paternal Grandfather and placed in foster care.

On August 11, 2008, the Court held a special hearing, the purpose of which was to assist the Court in determining what visitation by various people was in the best interest of the child. Father was present for the hearing along with his Court appointed attorney, David Hutt, Esquire. Because of the change in contract attorneys for the Court, Patricia O'Neill, Esquire, was now present to represent Mother. Unfortunately, Mother did not appear for the hearing. Mother was not transported because she had apparently been moved from her prior Work Release address to a half-way house identified as Plummer House. Mother failed to notify the Court of her change of address. Maternal Grandmother was happy with the visitation she was receiving, which consisted of one hour per week supervised at the DFS office. Father was also satisfied with the Division's announcement that they did not intend to reduce his visits. In fact, the Division indicated that Father's visits would likely be increased in the near future. The Division and Mother's counsel agreed that supervised visits at the Division of Family Services' office would commence once Mother was released from incarceration, since transporting the child in

a car for an extended trip would not be required, noting that such transport would likely upset the child.

As already noted, this child, after originally being placed in DFS custody on December 04, 2007, remained in the home of Paternal Grandfather and Maternal Grandmother until May 21, 2008. Had it not been for Mother's opposition at a hearing on February 04, 2008, the child would have been awarded to the guardianship of Paternal Grandfather and Maternal Grandmother. By the time Mother eventually indicated her approval to the grandparents' guardianship on March 17, 2008, with Father having previously expressed his approval, the CASA noted her opposition because of the future possibility of all of these individuals living under the same roof, and the recognition that there was a history of domestic violence between Mother and Father, and also between Father and his own father under this roof.

As previously noted, a Child Development Watch Multidisciplinary Evaluation Summary performed on the child on April 01, 2008, performed at a time when the child resided in the home of Maternal Grandmother and Paternal Grandfather, indicated that the child was age appropriate and doing well. At the hearing on April 21, 2008, the Division worker reported that the child was doing well in the home of the grandparents, and the child had a close relationship with his grandparents. The Court was most interested to learn from the experts their reasoning as to why this child underwent such a dramatic change from the time the child was living in the home of the grandparents to after the child's removal from that home and placement into a foster home. Quite frankly, the testimony of Kristen Wilson, who is employed as a counselor with Child Development Watch, and who holds a Bachelor's Degree in early childhood development, was not helpful in establishing some type of link between the child's conduct in the foster home and damages the child may have suffered when in the care of the paternal grandfather. The Court also was not assisted with the expertise of Dr. Cheryl Whinsby, a licensed clinical psychologist. Dr. Whinsby had only observed the child one time. Based upon this one time observation, Dr. Whinsby concluded on an initial basis that the child was suffering from Post Traumatic Stress Disorder. This Court has already noted its empathy with Paternal Grandfather's lack of cooperation with the DFS workers after the child was yanked from his care with police assistance. At the same time, and the one area which the Court found helpful from Dr. Whinsby's testimony, was her analysis of the conflict that was created by Paternal Grandfather's uncooperative attitude which led to upsetting the child. Dr. Whinsby opined that the grandfather was placing his own needs above those of the child where he found it more important to argue his position in front of the child rather than to relieve the child's stress by making his points outside of the child's presence.

Having heard the testimony of Kristen Wilson and Dr. Whinsby at the hearing on August 11, 2008, as well as the lack of clear evidence of domestic harm inflicted upon Maternal Grandmother, the Court, at that point, was not convinced that Paternal Grandfather should be prevented from visiting with this child. Even more, the Court was not convinced that the change in attitude of this child was caused by anything more than being ripped from the care of the one person who had consistently given him care throughout his entire young life, the paternal grandfather.

But the Court next heard the shocking, compelling, and very credible testimony of Paternal Grandfather's 30 year old adopted daughter, Jean Musselman

("Daughter"). Daughter was adopted by Paternal Grandfather when she was 4 years of age, after he had married her mother. Daughter resided with Paternal Grandfather and her mother from ages 4 to 10. Her half-brother, who is the child's father in this case, is approximately six years younger than Daughter. Her other half-brother, Father's brother, Joseph, is approximately seven years younger than her. Daughter's mother and Paternal Grandfather divorced when Daughter was around 10 years of age. Although Daughter first went to live with her mother in Pennsylvania along with her two half-brothers, Paternal Grandfather eventually obtained custody of all three children and brought them back to Delaware.

Although recalling some good times, the disturbing part of Daughter's testimony consisted of her memories of verbal, emotional, and physical abuse from Paternal Grandfather as well as her half-brother, the child's father in this case. Both Paternal Grandfather and Father told her on various occasions that Daughter's mother was a slut and a whore, and that she was just like her. Paternal Grandfather did nothing to stop Father from giving her fat lips, black eyes, and pushing her around. According to Daughter, Paternal Grandfather even defended his son in these actions.

When daughter was 12 or 13 years of age, her half-brother Joseph informed her that Paternal Grandfather had placed a hole in the shower wall in order to watch her when she showered. Daughter provided convincing details leading up to her discovery of Paternal Grandfather half naked attempting to observe her from the peep hole. Daughter also testified how Paternal Grandfather raped her on New Year's Eve when she was 16 years of age. She stated that a social worker, who she had contacted, told her that Paternal Grandfather would be arrested, and that her half-brothers and she would be split up into separate foster homes. Daughter did not report the events to the police, because she was afraid it would separate her from the only people who she knew.

Daughter ran away from Paternal Grandfather's home when she was 17, but she later returned. When Paternal Grandfather learned that she had her belly button pierced, he kicked her out of the house saying "Only whores and sluts get their belly button pierced." Daughter eventually went on to obtain an Associate's Degree in business. She has been working at the same job for the past 10 years. She hopes to go back to school and obtain a Bachelor's Degree.

Daughter testified that she continued to visit Paternal Grandfather every once in a while. However, she finally cut off contact with Paternal Grandfather about three years ago because her visits always consisted of Paternal Grandfather and her half-brother, Father in this case, putting her down and making her feel bad. Daughter now has her own 7–year–old son. Part of her decision to no longer have contact with Paternal Grandfather or Father was that she did not want to expose her own son to an environment where people were in and out of jail, police were regularly coming to the house, and where her son would learn to think it was okay to demean and disrespect women.

Even without referring back to its own Order of August 18, 2008, which details Daughter's testimony, the Court can recall watching Father and Paternal Grandfather sit stoically through the testimony, each appearing to be unmoved by the testimony. Although both Father and Paternal Grandfather were given the opportunity to cross-examine Daughter at the time, both declined. Furthermore, neither Father, who was represented by counsel, nor Pa-

ternal Grandfather offered to give any testimony in rebuttal.

As a consequence of hearing the testimony of Paternal Grandfather's adopted daughter, the Court's Order of August 18, 2008, prohibited any contact or visitation by Paternal Grandfather with the child. Furthermore, the Court's Order put Paternal Grandfather on notice that it would be his burden of proof to show that visits by him were in the best interests of his grandson. The Court specifically noted its expectation for Paternal Grandfather to undergo a psychological evaluation by a counselor of the Division's choosing before the Court would consider allowing any visitation between Paternal Grandfather and Grandson.

The Court's next hearing was a review hearing held on November 10, 2008. Both parents, along with their respective attorneys, appeared for the hearing. Both grandparents also appeared. The grandparents sat on opposite sides of the courtroom from each other. The Court's Order from this hearing reflects that Mother was still involved in the Crest Program in upstate Delaware, but was permitted to reside in the community at certain times. Furthermore, Mother failed to provide the Court with any information concerning her anticipated date of release, or what progress, if any, she was making on any of the programs which the prison offered which might satisfy the requirements under her case plan. Father was still attending visits with the child. Father was also now employed in a second job. Unfortunately, the Court's Order reflects that Father failed miserably to pursue his domestic violence classes since his intake evaluation of July 29, 2008. The Order also reflects that Father failed to follow up with his mental health evaluation recommendations, the evaluation being completed on July 31, 2008. The mental health evaluation required Father to undergo weekly counseling and monthly medication management. Father told a DFS worker that he stopped going to the mental health sessions because his counselor, Mr. Betts, simply talked about himself. In retrospect, after hearing Mr. Betts testify at a subsequent hearing, the Court could understand and temporarily excuse Father's lack of attendance at the sessions with Mr. Betts.

At the November 10th hearing the Court learned that Father had been attending substance abuse counseling. Somewhat bizarre, however, is that Father failed to mention to the DFS worker that he had been arrested on September 3rd and again on September 11, 2008, for separate drug related incidences. This was just one of several instances where Father conveniently neglected to mention important information. The culmination of the pattern of withholding important information by both Father and Paternal Grandfather eventually led the Court to conclude that the lack of mention of important information was deceptively intentional. Father was still looking for his own housing. He was spending time living between the home of Paternal Grandfather, and the child's great paternal grandfather.

At the November 10, 2008 hearing, the Court reminded all parties of their responsibility to successfully pursue completion of their case plans, the failure of which would likely result in the termination of their parental rights followed by an adoption. Mother reported that she was raped at age 11 by her Mother's then-husband's nephew, and her Mother's then-husband did not feed her. It made little sense to the Court that Mother was now living again with the very man who did not feed her.

Mother gave positive testimony concerning Paternal Grandfather. She described how he took her in when she was 14 years

of age. Although her own mother was "going to slots and getting beat up by guys," Paternal Grandfather was the one who made sure she went to school, and made sure that she was fed. Maternal Grandmother and Paternal Grandfather started living together for the first time when Mother, at age 14, and Father, at age 16, were dating.

The next hearing was a Permanency Hearing which occurred on January 12, 2009. The Court rendered its decision from this hearing on February 04, 2009, at which time the Court denied Father's motion to rescind DFS custody. The Court also dismissed Maternal Grandmother's guardianship petition at her request.

Both parents provided testimony at the Permanency Hearing which related to Paternal Grandfather's guardianship petition. Although Father had never attempted to rebut the previous testimony of his half-sister, he testified that he had no recollection of the events as testified to by his half-sister, and he would have only been 7 years old at the time.

The Permanency Hearing Order reflects that Mother has been subject to incarceration and related restrictions ever since April 10, 2008, and her earliest expected date of release into a Work Release Program would be April or May 2009. Mother provided neither witnesses nor certificates to demonstrate that she had satisfactorily completed in-prison programs of domestic violence counseling, substance abuse, or mental health. Although Mother stated that she had learned from her domestic violence program the necessity for her to pursue healthy relationships, she placed Father's name on her application for housing, and indicated a desire to live with him, despite a considerable previous history of domestic violence between them. Mother failed to demonstrate an understanding that the child could be emotionally harmed while witnessing arguments between her and Father that did not include any physical hitting in front of the child. As of the Permanency Hearing, Mother was still unable to establish that she could provide safe and stable housing for the child, or that she could provide for the child's financial needs through employment or otherwise.

The Court also reviewed Father's success, or lack of it, in completing his case plan towards reunification. Father had been employed for three consecutive months, the Division had accepted his certificate of completing and understanding the child development course, and Father had regularly attended his visitations. Although recognizing a certain amount of confusion on the DFS worker's part in directing Father to the appropriate 26 week domestic violence course rather than a 6 week anger management course, the Court was of the opinion that Father attempted to take advantage of the DFS worker's imprecise direction and failed to attend an evaluation which would have led him to the correct course. Father's lack of forthrightness with his counselor, Yvonne Dodd, was another attempt by Father to avoid the necessity of his involvement in the appropriate and more comprehensive domestic violence course. As of the Permanency Hearing, Father indicated that he had enrolled in a domestic violence program, and he understood the need for him to attend the 26 week long course. The Court also indicated in its Permanency Decision its disappointment that Father was arrested at such a critical time in January 2009, for drug related charges, which if proved to be true, occurred during a time when Father had to know that any drug involvement would have serious repercussions on his ability to be reunified with his son. The Court received no proof that Father was successfully discharged

from his substance abuse treatment program on December 30, 2008.

At the Permanency Hearing, the Court was less than impressed with the testimony of Father's mental health counselor, Ken Betts. Although the Court took little from the testimony of Mr. Betts, information provided in Father's answers to certain questions posed by Mr. Betts demonstrated additional episodes of Father not being forthright. Father failed to give full details of his prior assault history, his history of domestic violence, and his drug history.

The Court's Permanency Hearing Decision noted the lack of clarity from the Division worker as to what housing by Father would be acceptable. It was finally made clear at the Permanency Hearing that living with the child in the home of Father's grandfather, Wilber Newman, would not be acceptable as a stable environment because Wilber Newman had previously thrown Father out of his home.

Based upon the lack of success of either parent to successfully complete their case plan as of the January 12th hearing, the accomplishment of which would have led to their reunification with the child, the Court deemed it appropriate to change the permanency goal for this child from reunification to termination of parental rights followed by adoption. The Court's Order clearly explained to the parents that the Permanency Order did not mean that their parental rights were terminated at that time, or all hope was lost. However, the Court explained that the entry of the Permanency Order did mean that the Division of Family Services would no longer be responsible to provide reunification services to either parent. The Order made clear that either parent could still pursue these services on their own up to and prior to the Termination Hearing, and their parental rights would only be terminated if the Court found that there was clear and convincing evidence to terminate their parental rights. The Court's Order established that Paternal Grandfather's guardianship petition would be heard at the same time as the Division's petition to terminate the parental rights.

On July 20, 2009, the Court entered a Pre–Trial Order on the pending petition for termination of parental rights and Paternal Grandfather's petition for guardianship. The statements contained in the Order were previously announced to the parties in Court. The Order reflected that it would take judicial notice of the prior findings of fact made in the dependency case, would combine those findings of fact with the testimony given regarding progress or lack of it which had occurred since the Permanency Hearing, and consider this entire continuum of events from the time the child was taken into DFS custody on December 04, 2007, to the time of the hearing seeking the termination of parental rights. The Court explained that in order to terminate the parental rights in the child, the Division would need to prove by clear and convincing evidence that it was appropriate and in the child's best interest to terminate the parental rights of the parents. As to the guardianship petition of Paternal Grandfather, the Court permitted Paternal Grandfather the exceptional ability to recall as a witness his adopted daughter so that he would have the additional opportunity to ask her questions about her previous very damaging testimony. The Court also gave Paternal Grandfather the opportunity to call other witnesses he might deem helpful to rebut the earlier testimony of his adopted daughter.

### PRESENT EVIDENCE PRESENTED

The consolidated Termination of Parental Rights/Guardianship Hearing took two full days of testimony on August 10 and 13,

2009. If Paternal Grandfather was successful in his petition for guardianship, there would be no need to pursue the termination of the parents' rights. The Court therefore proceeded first with Paternal Grandfather's guardianship petition.

The first witness to present testimony was Dr. Joseph Zingaro. Dr. Zingaro is the Clinical Director of Forensic Evaluations at People's Place Counseling Center. Dr. Zingaro had performed a psychological evaluation on Paternal Grandfather on April 16, 2009. Originally, Paternal Grandfather would not authorize copies of the written report of his psychological evaluation to be provided to other parties in the case. He had intended to introduce the report into evidence without the testimony of Dr. Zingaro. When the hearing had to be continued because Father was not transported for the first scheduled day of hearings, Paternal Grandfather then provided copies of the report to the litigants at the Court's direction. Dr. Zingaro was then subpoenaed by the State to give testimony.

Dr. Zingaro's written report concluded, based upon the information provided by Paternal Grandfather and the psychological test results, that Dr. Zingaro found no evidence that would suggest Paternal Grandfather was not capable of parenting his grandchild. However, after learning more about the case and the lack of accurate reporting by Paternal Grandfather, Dr. Zingaro stated that his written report had no validity.

In the Court's opinion, this was another one of those situations common to both Paternal Grandfather and Father where they conveniently failed to provide critical information to an examiner thereby leading the examiner to come to an incorrect conclusion. For instance, the Court's Order of August 18, 2008, made it very clear that Paternal Grandfather would not get any visitation with his grandson until he met his burden of proof to show that visits by him were in the best interests of his grandson. To that effect, the Court indicated its expectation that Paternal Grandfather would undergo a psychological evaluation by a counselor of the Division's choosing before the Court would consider allowing any visitation between Paternal Grandfather and the child. This particular Order was issued at the conclusion of the hearing where Paternal Grandfather's adopted daughter gave very critical and believable testimony of acts of mental and sexual abuse inflicted upon her by Paternal Grandfather when she was a teenager. In fact, when discussing his adopted daughter with Dr. Zingaro, Paternal Grandfather simply indicated that he did a good job raising her. Paternal Grandfather did not mention to Dr. Zingaro her very alarming testimony. In addition to this obvious deception by Paternal Grandfather by failing to mention to Dr. Zingaro the recent testimony of his adopted daughter, Dr. Zingaro also noted Father's seemed apparent lack of awareness or lack of concern with Paternal Grandfather's own mother's health when he could not describe to Dr. Zingaro his mother's medical problems, although she had been bedridden for seven years. Paternal Grandfather also did not inform Dr. Zingaro that the child was in therapy. Paternal Grandfather understated the character and personality disorders of other relatives. Paternal Grandfather failed to inform Dr. Zingaro that the Court had prohibited any contact between Paternal Grandfather and the child. Had Dr. Zingaro known this, he would have asked Paternal Grandfather about his perception of why the Court stayed his contact. All in all, Dr. Zingaro testified that Paternal Grandfather had been deceptive in providing information to him.

The Court next heard from Stewart Johnson, a therapist who has been em-

ployed with People's Place for the past 19 years who specializes in treating children. Mr. Johnson first saw the child on July 29, 2008. Mr. Johnson initially observed a considerable amount of anxiety in the child, where the child isolated himself in his foster home. Mr. Johnson's initial diagnosis was that the child suffered from an adjustment disorder, and possible Post Traumatic Stress Disorder (PTSD). The PTSD possible diagnosis was based upon observation of the child's generalized anxiety and reactive attachment disorder. However, Mr. Johnson was unable to confirm this diagnosis due to the age and limited verbal skills of the child.

Mr. Johnson then began play therapy with the child, and the play therapy included the involvement of the foster mother. Initially, the child was easily startled. Progress at first was slow. However, in February 2009, the child began to increase in verbalization and made faster progress. The child's prognosis improved. More than coincidental, Stewart Johnson noted that this improvement, in hind sight, coincided with the time when visits by the child's father stopped, and the child was able to better focus. Mr. Johnson would not recommend any visits with family members at this point because the child is starting to verbally express memories of his prior family. The child has specifically recalled observing his father hit his grandmother, and the grandmother then hitting Father.

Mr. Johnson testified that the child initially did not appear to be bonded to anyone. As such, the child would go to anyone. Also, if the child encountered some difficulty, he previously went off by himself. Now he seeks the comfort of his foster mother. Loud noises used to upset the child. Now, he goes to his foster mother when he hears loud noises. At this point in time, Mr. Johnson finds that the child is very bonded to his foster mother.

Mr. Johnson testified that the child has made significant progress in dealing with his Reactive Attachment Disorder.

Since visitation by Father formerly ended in February 2009, Mr. Johnson noted, as a symptom of Reactive Attachment Disorder, that the child has not done anything to ask for a parent. The one exception was when the child talked about his father when he described, during play therapy, the hitting episode between Father and Grandmother.

Mr. Johnson cautioned the Court that any removal from the foster family at this time, where the child has developed a very healthy bond, could be devastating to the child at his age. If the Court were going to attempt to reunite the child with his mother, who has' not been in his life for a significant period of time due to her incarceration, Stewart Johnson anticipated reunification would require a long time through a very slow process of indirect contacts before any face to face contacts could begin with Mother. Mr. Johnson described the child's prognosis as good, having a potential in a few years to be a happy, well adjusted child. Mr. Johnson explained that disruption of the bond that the child has now formed with his foster family, who are a potential adoptive resource, would be detrimental at this time in the child's life and would likely have possible life long adverse consequences. Mr. Johnson also stated his opinion that the cause of the child's present mental health disorders, being Reactive Attachment Disorder and likely Post Traumatic Stress Disorder, were due to events the child observed in his biological family prior to entering foster care which would have included observations of violence, and the inconsistency of parental care.

It was noted to Mr. Johnson that Child Development Watch did a report on April 07, 2008, at which time they found the

child to be age appropriate. Two months later, however, in June of 2008, Child Development Watch came back and did a second report and voiced concerns. Mr. Johnson distinguished his observations, which deal with emotional issues of a child, from developmental issues observed by Child Development Watch. Between these two Child Development Watch evaluations, the child was removed from the care of his paternal grandfather. When asked whether that removal would have caused the changes in the child, Mr. Johnson noted that the removal from Paternal Grandfather's care would not have accounted for the extent of the post traumatic symptoms observed in this child.

The Court also heard testimony from JoEllen Kimmey, who is a social worker with Child Development Watch. Ms. Kimmey noted her present concerns that the child appears to be doing appropriately on all issues except certain adaptive skills, such as refusing to potty train. She also agrees with the recommendation of others, including Stewart Johnson, that the child be involved in an early intervention program offered by the school district where the child is able to have additional time to learn to socialize with peers.

The Court next heard testimony from Douglas J. Davis, Master Counselor at Sussex Correctional Work Release. Mr. Davis is the supervising probation officer for Mother. Mr. Davis described Mother as making exceptional progress in her drug related Crest Program where she is now at Work Release. He noted that Mother has now been employed since May 06, 2009. Mr. Davis was not sure of Mother's housing plans. Once Mother successfully completes her Level IV Crest Program, she will then be placed at Level III probation for a period of a year. If unsuccessful in that probation, she would return to a Level IV or Level V placement, which means she would be incarcerated, or have limited release privileges. Mr. Davis was unable to give any specifics about what type of domestic violence counseling Mother had received while incarcerated.

The Court had previously noted on the record and reiterated in a Pre–Trial Order dated July 20, 2009, that Paternal Grandfather would be permitted to recall as a witness his adopted daughter, who had earlier given such damaging testimony about him. The Court also permitted Paternal Grandfather to subpoena and call such other witnesses as he deemed necessary to rebut the testimony of his adopted daughter. He could also provide his own testimony in rebuttal of the adopted daughter's testimony. On July 27, 2009, Paternal Grandfather indicated that his witnesses would include himself, his 22 year old son, Joseph Newman, Dr. Zingaro, and possibly, Julie Wasserman, a school teacher at Sussex Central High School who knew both Paternal Grandfather and his adopted daughter. Dr. Zingaro appeared at the request of the State. Joseph Newman did not give testimony nor did Julie Wasserman.

Apparently, the only person Grandfather could obtain to give complimentary testimony was Beth Hunt. Beth Hunt traveled from Florida to give testimony at Paternal Grandfather's request. Although other parties objected to the last minute notification of Ms. Hunt's testimony, the Court permitted Ms. Hunt to testify. Ms. Hunt's testimony was somewhat confusing and contained a certain amount of bias. She described her relationship with Paternal Grandfather as "not really romantic," but she acknowledged "they had sex at least one time". At first she described having regular contact with Paternal Grandfather and his children almost on a daily basis. Upon cross-examination, however, it appeared that the regular contact occurred between 1987 and 1990, when she lived in

Greenwood, Delaware. Between 1990 and 1993, Ms. Hunt resided at Woodside, south of Dover, Delaware, and did not visit Father very often. Between 1993 and 1998, when she lived in Millsboro, Delaware, she visited Paternal Grandfather maybe one time a week. Between 1998 and 2001, when she lived in Laurel, Delaware, she would see Paternal Grandfather about once every three weeks. Ms. Hunt recalls seeing Paternal Grandfather help his children with their homework. She described Richard Newman, the child's father, as a good kid. She described her observations of Paternal Grandfather having a good relationship with his adopted daughter. However, she also indicated that she had talked with the adopted daughter at one time because the adopted daughter "felt threatened." This area of testimony was somewhat vague and confusing. It may have been that Ms. Hunt meant that Daughter was threatened by Father's relationship with Ms. Hunt. Yet at another occasion in her testimony, Ms. Hunt indicated that Daughter really did not confide in her. She also said that Daughter did not make up stories. Ms. Hunt acknowledged that she had heard that Father dropped out of school in the 7th grade. Ms. Hunt's testimony clearly did not overcome this Court's very serious concerns raised by the compelling testimony given by Paternal Grandfather's adopted daughter about the emotional and sexual abuse inflicted upon her by Paternal Grandfather as well as the atmosphere maintained in the home which promoted male dominance over women.

Paternal Grandfather also called as a witness Maternal Grandmother. Despite being called by Paternal Grandfather, Maternal Grandmother testified that the 8 years she lived with Paternal Grandfather were the 8 worst years of her life. Maternal Grandmother described how she and Paternal Grandfather would argue every time Father and Mother argued, with Paternal Grandfather always taking the side of Father. The Court had difficulty in finding any consistency in Maternal Grandmother's testimony. In one part of her testimony, she stated that Paternal Grandfather controlled her by not letting her go out. She stated that Paternal Grandfather would not allow the child to go out without him. Paternal Grandfather prohibited Maternal Grandmother from wearing make-up, and prohibited her from wearing certain clothing. And yet, Maternal Grandmother also testified that Paternal Grandfather did a good job caring for the child. When she separated from Paternal Grandfather on May 21, 2009, after being in the hospital, at a time when she had discussions with DFS worker McKenzie, Maternal Grandmother indicated in her present testimony that she did not ask the child to be removed from Paternal Grandfather, nor did she want the child to be removed from Paternal Grandfather. She also testified that her life with Paternal Grandfather was fine when the child was living with them. She stated that the real reason she left Paternal Grandfather was she fell back in love with her ex-husband with whom she had been communicating for quite some time. It should be noted that Maternal Grandmother has been fighting Multiple Sclerosis for the past several years. There were many years during her relationship with Paternal Grandfather when she was bedridden.

Probably the greatest significance in Maternal Grandmother's testimony is that she previously heard from Paternal Grandfather's sons about the alleged hole in the shower wall testified to by Paternal Grandfather's adopted daughter. Maternal Grandmother testified that she asked Paternal Grandfather once about the allegations, and that his only response was he "smiled and laughed." It was not until she finally heard the testimony of Paternal Grandfather's adopted daughter that she

believed the shower hole incident really occurred. Maternal Grandmother also called the Division of Family Services on an occasion when Father was coming to see the child at their home despite Court Orders prohibiting those visits. According to Maternal Grandmother, Paternal Grandfather was upset that she had contacted DFS.

Maternal Grandmother started receiving disability for her Multiple Sclerosis in 2004. Paternal Grandfather stopped working around that time both to take care of Maternal Grandmother and also because of his own health problems. Paternal Grandfather owns the house in which they were living. They used Maternal Grandmother's Social Security Disability income to pay the mortgage payments. In addition to that, Paternal Grandfather was able to make some money by breeding and selling Pit Bulls. He also collected and sold various tangible property items.

Paternal Grandfather called Edward Lawson as his next witness. Edward Lawson is Mother's father and a previous husband to Maternal Grandmother. Maternal Grandmother now lives with Edward Lawson. Mr. Lawson appeared in Court unshaven and in a T-shirt. At one time during his testimony, he acknowledged to Paternal Grandfather that he and Maternal Grandmother became divorced because they did not get along. Mr. Lawson stated that he "smacked her around a bit," and seemed to suggest that everyone does that. Although not testifying, Paternal Grandfather quickly responded that he did not.

Mr. Lawson also recalled Mother showing him scars where she had been burned with candle wax when she said she was residing in the home of Paternal Grandfather along with Father. Although no one asked Mother to show the scars to the Court, no one ever denied the existence of the scars or when and where they oc-

curred. Upon closer examination by the CASA attorney, Mr. Lawson testified that Mother had told him Father had poured the candle wax on her arms. This testimony was never rebutted.

Paternal Grandfather next gave his own testimony. He testified that he had helped raise the child since the child was born. He told the Court that the mortgage on his home was current, and that his home contains three bedrooms and two baths. He was presently not employed. He was living on a $25,000.00 personal injury settlement he had received in March 2009. As of the date of the hearing, only five months later, Paternal Grandfather had $10,000.00 remaining of that amount. However, Paternal Grandfather indicated that his health is now good, and he is prepared to return to work.

Paternal Grandfather attempted to rebut his adopted daughter's testimony by indicating there was "no hole in the wall." He testified that his adopted daughter is now back living with her real mother, thereby suggesting a possible combined motive of adopted daughter and her mother to get even with Paternal Grandfather.

The Court found interesting Paternal Grandfather's very clear recollection of the New Year's Eve when his adopted daughter was 16. This was the New Year's Eve that Adopted Daughter said Paternal Grandfather raped her. Paternal Grandfather recalled buying vodka and mixing it with orange juice with each of them drinking the combination while she was sitting on the couch and he was sitting on the floor. He testified to his recollection that he put the boys to bed, and then he and Adopted Daughter together watched the New Year's Eve ball fall. Paternal Grandfather then stated that he went to bed and she stayed on the couch. The Court is never surprised by the ability of a person, such as Adopted Daughter in this case, to

recall almost every detail of a significant and horrible event despite the passage of several years. But given that same passage of time, the Court was surprised by Paternal Grandfather's very vivid recollection of the details of that evening, where, at least from Paternal Grandfather's perspective, the evening was rather uneventful.

It was not unusual that Paternal Grandfather was able to recall the incident when Daughter was 18 years of age, and he discovered that she had a belly button ring. At that time, he gave her a choice to remain in his care and follow the rules by attending college or leave with the guy she was seeing. She left with the guy.

Paternal Grandfather testified that he had videos from 2007 to 2008 showing the child and him playing with toys, shoveling snow, playing with the dogs, and walking the dogs. He said the videos would also show the child playing with keys in the car and swimming. However, he did not produce the videos. He also testified that his adopted daughter brought her child to his home as recently as 2005, and he had photographs to prove it. However, he did not produce those photographs. The Court notes, however, that Adopted Daughter had previously acknowledged that she returned to Paternal Grandfather's home for awhile, but finally decided to stop, especially to keep her son from being influenced by Paternal Grandfather.

Paternal Grandfather testified that when Mother was present with the child, she nursed the child, bought toys for the child, played with the child, changed the child's diapers, bathed and dressed the child, and had good interaction with the child. According to Paternal Grandfather, the parents would take care of the child until they went to work, and then he would take over.

Upon cross-examination from the CASA's attorney, Paternal Grandfather testified that he felt he was a competent parent, that he took care of his children, but he had problems when his children got older. Indeed, Father quit school after 7th grade, and Paternal Grandfather did nothing to get Father back into school. Paternal Grandfather's other son, Joseph, dropped out of school in 6th grade.

Paternal Grandfather testified that Mother was living at his home on weekends, and he believed Mother would likely eventually live on her own. He was not sure at that time whether Father was going to live with him or not. Paternal Grandfather acknowledged that Father was in a mental hospital for a time period when he was 18 years of age. He also acknowledged that both of his sons, Father and Father's brother Joseph, have had drug problems over the years. In response to Catherine's hot wax scars, Paternal Grandfather, without denying the incident, stated that she was treated for burns at the hospital. Paternal Grandfather stated that he would overhear Mother and Father arguing, but he never saw them fighting. Although he attempted to get counseling for Father's drug problem, he eventually had to call the police because, as Paternal Grandfather testified, "he had no other choice."

The Court next heard from the Division's witness, DFS permanency worker Julie Schirmer. Under the Division's policy, Ms. Schirmer was assigned the case on January 06, 2009 just prior to the permanency hearing on January 12, 2009. She started work after receiving the Court's Permanency Order dated February 04, 2009.

Ms. Schirmer first reviewed any activity by Mother on her case plan since the Court's Permanency Order dated February 04, 2009. Mother had no visitation with the child, because Mother was incarcerated. Although Mother made a tele-

phone call on April 22, 2009, requesting a visit, Ms. Schirmer responded on May 07, 2009, denying that visitation request. Given that Mother was still incarcerated, that she was located up-state, and that Mother had now not seen the child for over a year, the Court agrees with the Division's decision to deny Mother this one visitation request.

Ms. Schirmer understood that Mother was still involved in the Crest Program, but she was employed. Ms. Schirmer also noted that Mother had previously completed her Strengthening Families class. Although Mother testified that she took some classes for domestic violence while in the Crest Program, and despite prior Orders of this case that put Mother on notice of her need to produce certifications or witness testimony, Mother provided no such information. Likewise, Mother provided no substantial information about her participation and success in substance abuse classes. Also, Mother provided no necessary information to satisfy the Division and the Court that she had pursued a mental health evaluation and any follow-up treatment. As to housing, Mother was still incarcerated. Paternal Grandfather had indicated that she might have to move back in with him, and he would be willing to drive her to her job.

Ms. Schirmer next reviewed Father's progress, or lack of it, on his case plan since the permanency hearing. Although Father was consistent in visiting his son up to the date of the Permanency Hearing, he stopped visiting after January 22, 2009. Father had no visits, nor did he request any visits, between January 23, 2009, and March 06, 2009. He also did not have any visits after he was incarcerated March 06, 2009. Because of Father's incarceration, he lost his employment. Father was still incarcerated as of the date of the present Termination of Parental Rights Hearing.

Father had completed his Strengthening Families class well before the Permanency Hearing. Father was unable to provide evidence that he had successfully completed his 26 week domestic violence perpetrator's classes. Although Father testified that he had participated in the Green Tree Prison Substance Abuse Rehab Program, there was no proof that he had successfully completed the program. Father has yet to undergo a mental health evaluation and subsequent recommendations. Finally, although stressed to Father at the Permanency Hearing his need to get housing other than housing offered by his father or his grandfather, he has not shared any plans for suitable housing.

Ms. Schirmer also testified about her discussions with Paternal Grandfather. She spoke to Paternal Grandfather on two occasions in July of 2009. Paternal Grandfather refused to provide Ms. Schirmer with a copy of his mental health evaluation which he indicated he had undergone with Dr. Zingaro on April 16, 2009. He also informed Ms. Schirmer that he had used a portion of his lump sum personal injury suit recovery to resolve his mortgage delinquency, that he had no job, and that he was too mentally upset over his grandson to get a job.

Ms. Schirmer also testified that the child was doing well. His most recent physical occurred on July 08, 2009. He had his first dental appointment on July 13, 2009. The child sees Stewart Johnson in counseling every other week. Ms. Schirmer is involved with the school and Mr. Johnson in arranging an early and slower transition for the child to eventually become involved in pre-school. Ms. Schirmer testified that the child has been living with Nancy and Jon Lietze, who are supportive and involved in pursuing the needs of the child, especially the graduated educational transition. The Lietze's have been identified

as a potential adoptive resource. Through Ms. Schirmer's testimony, the Court received into the record the statutorily required social report prepared in April of 2009. The report opposes Paternal Grandfather's guardianship, and recommends termination of parental rights as being in the child's best interest.

The next witness to give testimony related to Paternal Grandfather's guardianship petition was the child's father. He had no recollection of ever telling Maternal Grandmother about the hole in the shower. According to Father, the first time he ever heard about the hole in the shower was during the testimony of his half-sister. Given that he is six years younger than his half-sister, Father would have been about 12 years old when his half-sister eventually left the home when she was 18. He testified that Paternal Grandfather was the main caretaker for the child when he and Mother went out. Maternal Grandmother, on the other hand, mainly sat on the couch. Father supports Paternal Grandfather's petition for guardianship. He also testified that he has seen "lots of maturity" in Mother since her recent incarceration. Father testified that he previously had concerns about Mother's ability to care for the child. Despite his present incarceration, Father is opposed to termination of his parental rights. It would be his hope that the child would be transitioned and reunified with Mother. He testified that both he and Mother gave the child good care when the child was with them.

On cross-examination, Father testified that he and Mother plan to live together when they both get out of prison. He also testified about his understanding that Mother will leave him "if he messes up."

Father acknowledged that he is in jail because he chose to quit going to probation. Father acknowledged his understanding at the time that if he did not go to probation, that he would be locked up, and would therefore not be able to see his son. Although the Court applauded Father's earlier efforts throughout much of this case, Father understood that his decision to return to drugs would seriously jeopardize his chance to be reunified with his child. It is difficult for the Court to understand why Father made such a choice.

Father also stated that he understood domestic violence to be limited to physical violence between parties. Father believed that couples' yelling at each other is a regular characteristic of the relationships of 90% of the population, and that such conduct is not a part of domestic violence and does not cause harm to a child. Had Father taken the 26 week course for domestic violence perpetrators, he hopefully would have testified differently.

When cross-examined by his own father, Father testified that he did "not recall seeing his father hit his half-sister." His answer seemed less than certain. Father recalled a square panel on the outside of the shower wall, which he understood was used to cover the plumbing. The court has no way of knowing whether this may have been in the same area as the "peep hole."

The Court next heard the testimony of Mother. Although not having documentary or witness proof to present into evidence, Mother testified that she took classes in parenting, domestic violence, and relationships while incarcerated. She has been working since May 05, 2009. She is now working 40 hours a week. Again, without having any corroborating testimony, she understands she is in line for a promotion to be a shift manager. She has been able to save $2,000.00. She is also paying for her room and board, court fines, and child support. Although still on probation, Mother is no longer incarcerated. She has applied for living quarters. Moth-

er now owns a car, and thus has her own transportation. Mother testified that once she gets an apartment and lines up daycare, she would like to get the child back with her.

Mother asserted that she has changed her lifestyle. She is now paying her bills, not going out and partying, wants to read with her child, and interact with her child and other children. She says she has grown from her mistakes. Mother stated that she "had to go to jail to learn what is important—her son." Mother testified that she does not intend to use drugs anymore. She also testified that if she goes back to Father, it would be on condition that he no longer uses drugs. If Mother cannot have the child come back with her, she supports the guardianship petition of Paternal Grandfather. Mother acknowledged to the CASA attorney that she did not know whether the child would recognize her today. Mother also acknowledged that she is now living with Paternal Grandfather.

### LAW AND REASONING

The Court will first examine the guardianship petition wherein Paternal Grandfather is seeking to have guardianship of his 4–year–old grandson. The testimony presented demonstrates that Paternal Grandfather was the primary caretaker of this child up until the time the child was taken out of the home of Paternal Grandfather on May 21, 2008. If the Court were to award guardianship of this child to Paternal Grandfather, it would be unnecessary for the Court to proceed with considering whether the rights of the parents should be terminated. Indeed, rather than terminate the parents' rights, it would be the Court's preference to award guardianship of this child to a suitable relative. The Delaware Supreme Court has ruled that an award of guardianship satisfies the requirements of the Adoption and Safe Families Act, 42 U.S.C. §§ 620–679 because it "rises to the level of permanency." [2] Permanency is defined in the guardianship section of the Delaware Code to mean "the safe, stable, custodial environment in which a child is raised and the life-long relationship that child establishes with a nurturing caregiver." [3] In order for this Court to grant guardianship of this child to Paternal Grandfather, the Court must find by a preponderance of the evidence that it is in the best interest of the child for the guardianship to be granted.[4]

Given the testimony the Court has heard since this child was taken into care, the Court cannot find that it would be in this child's best interest to award guardianship to Paternal Grandfather. First of all, the very compelling and believable testimony of Paternal Grandfather's now adult adopted daughter indicated that Paternal Grandfather mentally and sexually abused her. Even more, Paternal Grandfather promoted in his home an environment that applauded male dominance and control over females. The adopted daughter's testimony was haunting. Except for very feeble attempts, her testimony was never rebutted. Although Maternal Grandmother's testimony was somewhat vague, she also spoke of the control and domination that existed in Paternal Grandfather's home. There has been an acknowledged history of domestic violence between the father and mother of this child which existed within Paternal Grandfather's home. Paternal Grandfather attempted to minimize and hide the serious problems he had

**2.** *CASA v. DFS*, 834 A.2d 63 (Del.2003).

**3.** Del.Code Ann. tit. 13, § 2302(15) (2009).

**4.** Del.Code Ann. tit. 13, § 2330(a)(2)b (2009).

in raising a family where his adopted daughter gave despicable testimony about him and both of his sons dropped out of school before high school. Paternal Grandfather made arrangements to see the child despite the Order of this Court. As this child matures and is able to verbalize, it is becoming clearer that this child suffers from the trauma and stress existing in the home where Paternal Grandfather was the primary person in control. The Court cannot help but note the isolation this family must have lived in where Paternal Grandfather's only witness called to rebut the existence of control and domestic violence in his home was in the very weak testimony of a woman who traveled from Florida. It is difficult for this Court to believe that Paternal Grandfather was unable to find more witnesses from friends or relatives to establish the existence of a normal, safe, nurturing, and non-controlling environment under Paternal Grandfather's roof.

■ We now turn to the termination of parental rights petition filed by the Division of Family Services against Mother and Father. In each case, the grounds sought for termination of the parental rights is the parents' failure to plan, pursuant to 13 Delaware Code, Section 1103(a)(5).[5] This child has now been in the care of the Division of Family Services in excess of 12 months, since May 21, 2008, when the child was removed from the home of the paternal grandfather and placed into foster care. Although contin-

---

**5.** (a) The procedure for termination of parental rights for the purpose of adoption or, if a suitable adoption plan cannot be effected, for the purpose of providing for the care of the child by some other plan which may or may not contemplate the continued possibility of eventual adoption, may be initiated whenever it appears to be in the child's best interest and that 1 or more of the following grounds exist:

(5) The parent or parents of the child, or any person or persons holding parental rights over the child, are not able, or have failed, to plan adequately for the child's physical needs or mental and emotional health and development, and 1 or more of the following conditions are met:

 a. In the case of a child in the care of the Department or a licensed agency:

 1. The child has been in the care of the Department or licensed agency for a period of 1 year, or for a period of 6 months in the case of a child who comes into care as an infant, or there is a history of previous placement or placements of this child; or

 2. There is a history of neglect, abuse or lack of care of the child or other children by the respondent; or

 3. The respondent is incapable of discharging parental responsibilities due to extended or repeated incarceration, except that the Court may consider postconviction conduct of the respondent; or

 4. The respondent is not able or willing to assume promptly legal and physical custody of the child, and to pay for the child's support, in accordance with the respondent's financial means; or

 5. Failure to terminate the relationship of parent and child will result in continued emotional instability or physical risk to the child. In making a determination under this paragraph, the Court shall consider all relevant factors, including:

 A. Whether the conditions that led to the child's placement, similar conditions of a harmful nature, continue to exist and there appears to be little likelihood that these conditions will be remedied at an early date which would enable the respondent to discharge parental responsibilities so that the child can be returned to the respondent in the near future;

 B. The respondent's efforts to assert parental rights of the child, and the role of other persons in thwarting the respondent's efforts to assert such rights;

 C. The respondent's ability to care for the child, the age of the child, the quality of any previous relationship between the respondent and the child or any other children;

 D. The effect of a change of physical custody on the child; and

 E. The effect of a delay in termination of the chances for a child to be placed for adoption.

ued to be placed with Paternal Grandfather until May 21, 2008, the child originally came into DFS custody on December 04, 2007, when an initial guardianship petition filed by Maternal Grandmother noted a considerable prior history of domestic violence between Mother and Father, some of which, at times, involved the grandparents. Even before Mother's most recent incarceration, when she made a choice to again become involved in drugs rather than make the necessary choices to have her child back, Mother failed miserably to complete her case plan. She was unemployed, she had failed to provide proof of having appropriate mental health treatment, she did not obtain necessary domestic violence counseling, and she did not obtain satisfactory and safe housing.

As a result of her latest incarceration, where she is doing extremely well according to her probation officer, Mother has now told the Court that it took incarceration for her to learn how much her child meant to her. In an Order of this Court dated November 10, 2007, the Court stated on page 6 of the Order that, "Mother has provided absolutely no information as to how she is progressing on her case plan through programs in the prison, nor has she provided any anticipated date of release." On page 8 of the Court's Permanency Order dated February 04, 2009, the Court noted, "Although her attorney submitted certain certificates into the record, these various certificates do not satisfy the Court's requirements in this case where substance abuse and domestic violence have been prevalent, and where witness testimony on this issue is absolutely necessary for the welfare of this child." Although Mother purports to have completed such courses while incarcerated, Mother failed to produce these necessary witnesses, the necessity of which was clearly anticipated for her in the Court's previous Orders. While Mother is to be congratulated that she is now employed, she still

has no definite plan for future housing, and she is presently most likely living with Paternal Grandfather. Furthermore, Mother is likely to return to living with Father who has never successfully completed a domestic violence perpetrators course, and who fails to even recognize that he is a perpetrator of domestic violence. Finally, because of Mother's incarceration through much of this case, the child has formed no bond with Mother. By her own admission, the child most likely would not recognize Mother.

This child requires permanency. The Court sincerely hopes that Mother will keep these new promises to live a better life. If she does, she will have the opportunity to be a good mother to other children she may raise in the future. But with this child, where mother has failed him for so long, the Court cannot gamble this child's future permanency, stability, safety, and best interests on mother's present promises which are unsupported by her prior life style and actions.

As to Father, he was generally progressing well under his case plan, and he was the best hope for this child to be reunified with a parent. He was exercising appropriate visitation, but then he ceased visitation. He was employed, but then he lost employment. He never obtained suitable alternative housing. He was always evasive in his requirements to pursue appropriate perpetrators' classes in domestic violence. Most of all, Father made a choice to return to drugs in January 2009. He was well aware that such a choice would compromise his chances of being reunified with his son, and would likely lead to the termination of his parental rights.

In the case of each of these parents, the Court has reviewed the facts gathered by this Court since this child was first taken into care up to the Permanency Hearing. The Court has then added to that evidence

the additional facts that have occurred since the Permanency Hearing to the date of the Termination of Parental Rights Hearing. Those additional facts have demonstrated the failure of either parent to make any additional progress since the Court's Permanency Order of January 04, 2009. Considering this "continuum of evidence" [6] since the child was first taken into care up to the present date, the Court finds that the Division of Family Services has proven by clear and convincing evidence that each of these parents has failed to plan under at least one, if not all of the paragraphs 1 through 5 contained in 13 Delaware Code, Section 1103(a)(5)a.[7]

 The Supreme Court of the United States has recognized that the parental right is a sacred one.[8] However sacred the right may be, that right also carries a parent's responsibility to provide and plan adequately for their child's physical needs and mental and emotional health and development. Failure to meet that parental obligation to a child can lead to the termination of the parent's sacred right. Pursuant to Delaware Title 13, Section 1103(a) parental rights can only be terminated where, (1) there has been proof of one of the enumerated statutory grounds set forth therein, and (2) termination of one's parental rights would be in the best interest of the child. The Court must first determine that one of the statutory grounds exists.[9] The State bears the burden of proving that the statutory requirements have been met. Furthermore, recognizing the importance of a parent's sacred right, the State must prove "by clear and convincing evidence, that the parent is unable to meet the statute's guidelines." [10] This is a higher standard of proof than the often-used "preponderance of the evidence" standard. This higher standard helps guarantee that a parent only sacrifices their sacred right when the parent has clearly failed to fulfill their equally sacred obligation to the child.[11]

In considering what is the best interest of the child, the Court uses as its guide the criteria set forth in DEL.CODE ANN. TIT. 13, § 722 [12], which sets forth the best interest

6. *See Powell v. Department of Services for Children, Youth and Their Families*, 963 A.2d 724 (Del.2008).

7. Any one of the subcategories, ranging from time in care, history of neglect or abuse, incarceration, inability to assume responsibilities to support, and concerns of emotional and/or physical danger, all exist in this case. Any one of them is grounds to terminate.

8. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599 (1982).

9. *In re: Hanks*, 553 A.2d 1171, 1179 (Del. 1989); *Shepherd v. Clemens*, 752 A.2d 533, 537 (Del.2000); *In re: Kelly Stevens*, 652 A.2d 18, 25 (Del.1995).

10. *Hanks*, at 1178.

11. *Patricia A.F. v. James R.F.*, 451 A.2d 830, 831 (Del.1982).

12. Del.Code Ann. tit. 13, § 722 (2009).
(a) The Court shall determine the legal custody and residential arrangements for a child in accordance with the best interests of the child. In determining the best interests of the child, the Court shall consider all relevant factors including:
(1) The wishes of the child's parent or parents as to his or her custody and residential arrangements;
(2) The wishes of the child as to his or her custodian(s) and residential arrangements;
(3) The interaction and interrelationship of the child with his or her parents, grandparents, siblings, persons cohabiting in the relationship of husband and wife with a parent of the child, any other residents of the household or persons who may significantly affect the child's best interests;
(4) The child's adjustment to his or her home, school, community;
(5) The mental and physical compliance of all individuals involved;
(6) Past and present compliance by both parents with their rights and responsibilities to their child under § 701 of this title; and

standards applicable to a custody action. *Shepherd v. Clemens,* Del.Supr., 752 A.2d 533 (2000); *Daber v. Division of Child Protective Services,* Del.Supr., 470 A.2d 723, 727 (1983).

The Court is satisfied that the Division has proved by clear and convincing evidence the statutory requirements for termination of both parents' parental rights as previously noted. Furthermore, having considered all the factors in 13 Delaware Code § 722, especially the criminal records of the parents, the prior evidence of domestic violence and control between the parents and within the home of the paternal grandfather, the significant concerns regarding the child's present and long term stability, and the significant time that would be necessary to introduce mother back into the child's life, assuming mother's future conduct would remain consistent for the child's safety and welfare, the Court is satisfied that the termination of the parental rights in this child is in the child's best interest.

Although not altering the Court's decision to terminate, the Court also notes that the child has bonded with his present foster parents, and the foster parents are an adoptive resource.[13] Stewart Johnson has indicated that the removal of the child from the foster parents at this date could be detrimental to the child. The foster parents are working with Stewart Johnson and other experts to assist this child in his emotional and mental development by attending counseling and being in accord with the slow transition this child needs to become involved in future school.

The social report placed into the record pursuant to the requirements of 13 Delaware Code, Section 1105 recommends the termination of the parents' parental rights.

Finally, the Court is satisfied that the Division made reasonable efforts, and developed a meaningful case plan for each parent, in order to give each parent their best opportunity to learn and to demonstrate that they could be reunified with their child in order to provide the child with appropriate and adequate care. Both parents failed.

**ORDER**

For the foregoing reasons:

1. The petition of Lester Newman, paternal grandfather, seeking guardianship of his grandson who is the subject matter of this action, is hereby DENIED.

2. The Division of Family Services has met its burden of proving by clear and convincing evidence that the parental rights of each parent in the child who is the subject matter of this action should be terminated, and that termination is in the best interest of the child.

3. The parental rights of each of the parents in the child who is the subject matter of this action are hereby

---

(7) Evidence of domestic violence as provided for in Chapter 7A of this title.

(8) The criminal history of any party or any other resident of the household including whether the criminal history contains pleas of guilty or no contest or a conviction of a criminal offense

(b) The Court shall not presume that a parent, because of his or her sex, is better qualified than the other parent to act as a joint or sole legal custodian for a child or as the child's primary residential parent, nor shall it consider conduct of a proposed sole or joint custodian or primary residential parent that does not affect his or her relationship with the child.

13. The Court limited the CASA's questioning about apparent concerns regarding the foster parents which may be heard if and when the foster parents seek adoption.

TERMINATED, effective immediately, with said rights transferred to the Division of Family Services, The Department of Services for Children, Youth and Their Families of the State of Delaware, for purposes of adoption.

IT IS SO ORDERED.